275 F.3d 391 (4th Cir. 2001)
 NOTRA TRULOCK, III; LINDA CONRAD, Plaintiffs-Appellants,
v.
LOUIS J. FREEH, in his personal capacity; NEIL GALLAGHER, in his personal capacity; STEVE DILLARD, in his personal capacity; BRIAN HALPIN, in his personal capacity; STEVEN CARR, in his personal capacity; JANE DOE, I, in her personal capacity, Defendants-Appellees.
 No. 00-2260
 UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
 Argued: May 7, 2001
Decided: December 28, 2001
 
 1
 Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Albert V. Bryan, Jr., Senior District Judge. (CA-00-1268-A)[Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 
 
 2
 COUNSEL ARGUED: Larry E. Klayman, JUDICIAL WATCH, INC., Washington, D.C., for Appellants. Richard Alan Olderman, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. ON BRIEF: Paul J. Orfanedes, Brett M. Wood, John L. Martin, JUDICIAL WATCH, INC., Washington, D.C., for Appellants. Stuart E. Schiffer, Acting Assistant Attorney General, Helen F. Fahey, United States Attorney, Barbara L. Herwig, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.
 
 
 3
 Before MICHAEL and GREGORY, Circuit Judges, and Benson Everett LEGG, United States District Judge for the District of Maryland, sitting by designation.
 
 OPINION
 LEGG, District Judge:
 
 4
 This case requires us to determine whether the Appellants' complaint, which the district court dismissed under FRCP 12(b)(6), alleges sufficient facts to proceed to discovery. We agree that their Fourth Amendment claims (count one), alleging an illegal interrogation and search of a townhouse and a computer, were properly dismissed, primarily on the basis of qualified immunity. We conclude, however, that the complaint sufficiently pleads a claim under the First Amendment that the Defendants searched Trulock's home and computer in retaliation for a magazine article that Trulock wrote, criticizing the White House, the Federal Bureau of Investigation ("FBI") and other departments of the federal government. Accordingly, we reverse and remand the First Amendment claim (count two) for further proceedings.
 
 I.
 
 5
 Notra Trulock served as the Director of the Office of Intelligence of the U.S. Department of Energy ("DOE") from 1994 to 1998. From 1995 to 1998, Trulock also served as the DOE's Director of the Office of Counterintelligence. Trulock alleges that he uncovered evidence that Chinese spies had systematically penetrated U.S. weapons laboratories, most significantly the Los Alamos Nuclear Laboratory. Trulock contends that the White House, the FBI, and the Central Intelligence Agency ("CIA") ignored his repeated warnings about the espionage. Congress eventually learned of the security breach and in 1998 invited Trulock to testify, which he did on several occasions. That same year, Trulock was demoted within the DOE; he was ultimately forced out in 1999.
 
 
 6
 In early 2000, Trulock wrote an account of his findings, which criticized the White House, the DOE, the FBI, and the CIA for turning a blind eye to the security breach. Trulock claims that the manuscript did not include any classified information. Nonetheless, in March of 2000, Trulock submitted the manuscript to the DOE for a security review, but the DOE declined to examine it. Afterward, Trulock sent the manuscript to the National Review, which published an excerpt in an edition that was circulated in early July of 2000. Although neither side placed the article in the record, the parties agree that it charged the administration with incompetence.
 
 
 7
 Plaintiff Linda Conrad has been the Executive Assistant to the Director of the Office of Intelligence at the DOE for more than six years. During Trulock's tenure she reported to him. Conrad now reports to Trulock's successor, Lawrence Sanchez. Trulock and Conrad live in a Falls Church, Virginia townhouse, which Conrad owns.
 
 
 8
 Conrad alleges that on the morning of July 14, 2000, when she arrived at work, Sanchez took her aside to say that the FBI wanted to question her about Trulock. Sanchez warned her that the agents had a warrant to search the townhouse and would break down the front door, in the presence of the media, if she refused to cooperate. Although the Plaintiffs allege that Sanchez made this statement to Conrad "on behalf of the FBI," the complaint does not recite a factual basis for this assertion. Nor does the complaint allege that any of the five individual Defendants either directed Sanchez to make the threat or knew about it.
 
 
 9
 Later that day, around 4:00 p.m., FBI Special Agents Brian Halpin and Steven Carr arrived at DOE headquarters and escorted Conrad to a conference room. Although the complaint states that they were armed, Conrad does not contend that the agents displayed their weapons, raised their voices, or otherwise threatened her during the three hour interview.
 
 
 10
 According to the complaint, Conrad was able to receive two incoming telephone calls, one of which was from Trulock, but that the agents "would not let [her] take either telephone call in private." (J.A. at 9.) The complaint further alleges that the agents refused to allow Conrad to make any outgoing calls. The complaint implies that Conrad was not at liberty to leave the conference room. When questioned on this point during oral argument, however, Conrad's attorney could not assert that she ever tried to leave the room (e.g., to place a call in private) or that the agents told her that she was not free to terminate the interview and leave.
 
 
 11
 The agents queried Conrad about Trulock's personal records and computer files. Conrad responded that she shared a computer with Trulock, but that each of them maintained separate, passwordprotected files on the hard drive. Conrad and Trulock did not know each other's passwords and could not, therefore, access each other's private files, Conrad stated.
 
 
 12
 The agents questioned Conrad for about three hours. Towards the end of the interview, the agents gave Conrad a form, which they asked her to sign. The complaint alleges that the agents did not explain the form to Conrad and that Conrad did not read it, learning only afterwards that she had consented to a search of her house. The complaint does not allege that the agents claimed to have a search warrant, threatened to break down Conrad's door if she refused to sign, or mentioned the media. Conrad does maintain, however, that she was fearful, crying and shaking.
 
 
 13
 At the end of the questioning, the agents followed Conrad to her townhouse, where Trulock was waiting. When Trulock asked to see the search warrant, the agents responded that they had no warrant but that Conrad had consented to the search. The complaint does not contend that Conrad tried to withdraw her consent or that Trulock tried to bar the search on the ground that his consent, as a resident of the house, was also necessary.
 
 
 14
 The agents located the computer in the bedroom. Special Agent Carr and an unidentified FBI computer specialist (named in the complaint as Jane Doe I) searched the computer's files for about ninety minutes. The complaint alleges that Agent Carr looked at Trulock's password protected files. When the search was over, the specialist, after giving Conrad a receipt, took the hard drive away.
 
 
 15
 Two weeks later, Conrad and Trulock filed the instant Bivens suit.[1] Count one of the complaint, brought under the Fourth Amendment, alleges that: (i) the Defendants violated Conrad's rights by seizing her during the interview; (ii) the Defendants violated Conrad and Trulock's rights by coercing Conrad's consent to search their home; and (iii) that Conrad's consent, even if voluntary, was insufficient to permit the search of Trulock's private computer files. In count two, brought under the First Amendment, Trulock contends that the FBI conducted the search and seizure in direct retaliation for the unflattering magazine article.
 
 
 16
 Prior to discovery, the Defendants moved under Fed. R. Civ. P 12(b)(6) to dismiss the complaint, arguing that it failed to state a constitutional violation either for unlawful search and seizure or for retaliation. Each Defendant also argued that he was entitled to qualified immunity on both counts. The district court granted Defendants' motion to dismiss, holding that the Defendants, having violated no clearly established law, were entitled to qualified immunity. With respect to Trulock's retaliation claim, the district court concluded that "other than the timing of the interrogation and search, the complaint presents no indications that the actions by the defendants were other than a good faith effort to determine whether classified information was being unlawfully possessed." (J.A. at 43.)
 
 
 17
 Because the district court granted Defendants' motion to dismiss, our review is de novo. Stuart Circle Hospital Corp. v. Aetna Health Management, 995 F.2d 500 (4th Cir. 1993). Like the district court, we must assume all facts plead by Appellants to be true. Mylan Labs, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993).
 
 II.
 
 18
 Qualified immunity shields government officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). This immunity "protects law enforcement officers from`bad guesses in gray areas' and ensures that they are liable only `for transgressing bright lines.'" Wilson v. Collins, 141 F.3d 111, 114 (4th Cir. 1998) (quoting Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992)). Immunity applies to "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). Government officials performing a discretionary function are immune from liability for civil damages unless (i) the officers' conduct violates a federal statutory or constitutional right; (ii) the right was clearly established at the time of the conduct; and (iii) an objectively reasonable officer would have understood that the conduct violated that right. Milstead v. Kibler, 243 F.3d 157, 161 (4th Cir. 2001) (citing Wilson v. Layne, 526 U.S. 603, 614-15 (1999)).
 
 
 19
 The first step in analyzing whether qualified immunity exists is to determine whether the plaintiff has alleged a violation of a statutory or constitutional right. Siegert v. Gilley, 500 U.S. 226, 231 (1991); see also County of Sacramento v. Lewis, 523 U.S. 833, 841 n.5, 118 S. Ct. 1708, 140 L.Ed.2d 1043 (1998) (noting that if courts were to rule on qualified immunity without determining the constitutionality of the challenged conduct, "standards of official conduct would tend to remain uncertain, to the detriment both of officials and individuals").
 
 
 20
 Next, the trial court must assess whether the right at issue was clearly established at the time of the breach. The court should focus upon "the right [not] at its most general or abstract level, but at the level of its application to the specific conduct being challenged." Wiley v. Doory, 14 F.3d 993, 995 (4th Cir. 1994) (internal quotations omitted) (quoting Pritchett v. Alford, 973 F.2d 307, 312 (4th Cir. 1992)); see also Anderson v. Creighton, 483 U.S. 635, 639-41 (1987) ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right"). This does not mean, however, that an official will be protected by qualified immunity unless the very act in question has previously been held unlawful. Anderson, 483 U.S. at 640. Rather, the unlawfulness must be apparent in light of pre-existing law. Id.
 
 
 21
 Only if the plaintiff has alleged a violation of a clearly established right should the court next determine whether a reasonable person in the official's position would have known that his actions violated that right. DiMeglio v. Haines, 45 F.3d 790, 794 n.1 (4th Cir. 1995). When the inquiry reaches this juncture, "the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." Harlow, 457 U.S. at 818-19.
 
 III.
 A.
 
 22
 Conrad first alleges that the agents, in violation of her Fourth Amendment rights, illegally seized her during their heavy-handed interrogation. The district court concluded that Ms. Conrad was not in custody during her interview. We agree.
 
 
 23
 A person is "seized" only when, by means of physical force or a show of authority, his freedom of movement is restrained. United States v. Mendenhall, 446 U.S. 544, 553 (1980).[2] A seizure has occurred if, in view of all the surrounding circumstances, a reasonable person would have believed that he was not free to leave. Id. at 554, 100 S. Ct. 1870; see also Michigan v. Chesternut, 486 U.S. 567, 573 (1988). A person need not make an attempt to leave in order to be seized. Mendenhall, 446 U.S. at 554. The threatening presence of several officers, the display of a weapon by an officer, some physical touching, or the use of words or a tone of voice suggesting that compliance with the officer's request might be compelled, can all translate into a seizure. Id.
 
 
 24
 Conrad argues that a seizure took place because the agents would not allow her to call anyone during the interview, they would not allow her to take two incoming phone calls in private, and they told her not to tell anyone about the interview. Conrad also points to Sanchez' statement to her that the FBI had a search warrant for her home and that "if she did not agree to cooperate, [the FBI] would break down her front door to execute the warrant, [and] the media would be present." (J.A. at 6.)[3] According to Conrad, this statement made her feel as though she was not free to leave.
 
 
 25
 These factors simply do not amount to a seizure. The interview transpired at a familiar setting, Conrad's workplace. The agents wore no uniforms and displayed no weapons. There are no allegations that the agents used physical force, threatening language, or an intimidating tone. Concerning the phone calls, Conrad does not allege that she attempted to leave the room (to place or take a call in private) and was refused. Nor does she allege, either in the complaint or in her briefs, that the agents told her that she was not free to leave the conference room. Conrad apparently contends only that the agents would not themselves leave the room to give her privacy to talk.
 
 
 26
 Moreover, Sanchez' statement, though heavy-handed, would not make a reasonable person feel that she was restricted from leaving the interview. The conversation between Conrad and Sanchez pertained to the search of her home and not the ground rules for the interview. In addition, Sanchez made the statement when Conrad first arrived at work, whereas the FBI questioning of Conrad took place several hours later at the end of the day. There is no allegation that Conrad queried the agents about the warrant or the threat. Nor does Conrad allege that the agents knew about Sanchez' statement. Accordingly, we affirm the district court's decision that Conrad was not "seized" during her interview.
 
 B.
 
 27
 Appellants next allege that the search of their computer and home was illegal because (i) the agents had no warrant, and (ii) Conrad's consent to search was involuntary. The Defendants concede that there was no warrant, but contend that the search was valid because Conrad signed a consent form.
 
 
 28
 Valid consent is a well-recognized exception to the Fourth Amendment prohibition against warrantless searches. Schneckloth v. Bustamonte, 412 U.S. 218 (1973). Consent to search is valid only if it was knowing and voluntary and courts assess validity based on the "totality of the circumstances." Mendenhall, 446 U.S. at 557.[4]
 
 
 29
 Appellants rely primarily on Bumper v. North Carolina, 391 U.S. 543 (1968). In Bumper, the police searched a house that the defendant shared with his grandmother. When the police arrived, an officer told the defendant's grandmother that they had a search warrant. She responded, "go ahead," and opened the front door. The Supreme Court held that the police could not rely on the grandmother's consent, which was given only after the official conducting the search asserted that he possessed a warrant. Id. at 550, 88 S. Ct. 1788. The Court observed that acquiescence to an assertion of lawful authority does not constitute an understanding, intentional and voluntary waiver of rights under the Fourth Amendment, concluding, "[t]he situation is instinct with coercion . . . [w]here there is coercion, there cannot be consent." Id. at 549-50, 88 S. Ct. 1788.
 
 
 30
 Conrad's consent is invalid under the rationale of Bumper. Although the agents who conducted the search never claimed to have a warrant, Sanchez told Conrad that the FBI had a search warrant, Conrad believed that Sanchez was conveying this information on behalf of the FBI, and the complaint alleges that Sanchez was indeed acting at the FBI's behest.
 
 
 31
 Nevertheless, the district court was correct in holding that the Defendants have qualified immunity. The Defendants fall into two categories, the first of which includes Special Agents Halpin and Carr, who secured the consent and conducted the search. There is neither an allegation nor any evidence that these agents directed Sanchez to misrepresent that the FBI possessed a warrant or that the agents even knew about Sanchez' statement. Conrad never mentioned the statement to them. The agents gave Conrad an explicit waiver form, which she signed. The agents truthfully told Trulock that they had no warrant, but that they had secured Conrad's consent. Based upon these facts, no reasonable officer would have believed that Conrad's consent was involuntary. Accordingly, Agents Halpin and Carr enjoy immunity.
 
 
 32
 The second group of defendants include former FBI Director Freeh and two FBI supervisors, Gallagher and Dillard. In a Bivens suit, there is no respondeat superior liability. Estate of Resenberg v. Crandell, 56 F.3d 35, 37 (8th Cir. 1995). Instead, liability is personal, based upon each defendant's own constitutional violations. While the complaint alleges that Sanchez was speaking at the request of the FBI, there is no allegation that any of these three individuals were personally complicit in Sanchez' alleged misrepresentations. Accordingly, these Defendants also enjoy immunity.
 
 C.
 
 33
 Trulock argues that the search of his password-protected files violated his Fourth Amendment rights. He asserts that the search was improper because: (i) there was no warrant; (ii) neither he nor Conrad consented voluntarily to the search; and (iii) even if Conrad's consent were valid, she did not have the authority to consent to a search of his password-protected files. As we have previously stated, Bumper leads us to conclude that Conrad's consent to search was involuntary. Even if her consent were voluntary, however, it would not authorize a search of Trulock's private, password-protected files.
 
 
 34
 Consent to search in the absence of a warrant may, in some circumstances, be given by a person other than the target of the search. United States v. Block, 590 F.2d 535, 539 (4th Cir. 1978). Two criteria must be met in order for third party consent to be effective. First, the third party must have authority to consent to the search. Stoner v. California, 376 U.S. 483 (1964). Second, the third party's consent must be voluntary. Bumper, 391 U.S. at 548.
 
 
 35
 Authority to consent originates not from a mere property interest, but instead from "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that others have assumed the risk that one of their number might permit the common area to be searched." United States v. Matlock, 415 U.S. 164, 171 n. 7 (1974); accord Frazier v. Cupp, 394 U.S. 731, 740 (1969) (holding that joint use of a duffel bag gave a third party authority to consent to the search of the bag).
 
 
 36
 We conclude that, based on the facts in the complaint, Conrad lacked authority to consent to the search of Trulock's files. Conrad and Trulock both used a computer located in Conrad's bedroom and each had joint access to the hard drive. Conrad and Trulock, however, protected their personal files with passwords; Conrad did not have access to Trulock's passwords. Although Conrad had authority to consent to a general search of the computer, her authority did not extend to Trulock's password-protected files. See Block, 590 F.2d at 541.
 
 
 37
 In United States v. Block, this Court held that the defendant's mother had authority to consent to a search of his room, which was located in the home they shared. The mother's authority did not extend to a search of a locked footlocker located within the room, however. We noted that authority to consent "cannot be thought automatically to extend to the interiors of every discrete enclosed space capable of search within the area . . . the rule has to be one of reason that assesses the critical circumstances indicating the presence or absence of a discrete expectation of privacy with respect to the particular object." Id. at 541.
 
 
 38
 Trulock's password-protected files are analogous to the locked footlocker inside the bedroom. By using a password, Trulock affirmatively intended to exclude Conrad and others from his personal files. Moreover, because he concealed his password from Conrad, it cannot be said that Trulock assumed the risk that Conrad would permit others to search his files. Thus, Trulock had a reasonable expectation of privacy in the password-protected computer files and Conrad's authority to consent to the search did not extend to them. Trulock, therefore, has alleged a violation of his Fourth Amendment rights.
 
 
 39
 Nevertheless, the Defendants are entitled to immunity because a reasonable officer in their position would not have known that the search would violate clearly established law.[5] At the time of the search, at least one published case, although from a district court outside this circuit, held that a third party may consent to the search of a shared computer when the third party has complete access to the computer. See United States v. Smith, 27 F. Supp. 2d 1111 (C.D. Ill. 1998). But see United States v. Barth, 26 F. Supp. 2d 929 (W.D. Tex. 1998) (holding that a computer repair technician did not have authority to consent to a search of the defendant's computer).
 
 
 40
 Conversely, we are aware of no reported cases answering whether an individual has a reasonable expectation of privacy in passwordprotected files stored in a shared computer. Trulock, though conceding the absence of computer specific caselaw, urges us to recognize a clearly established right based upon Block and other similar cases. We decline to do this. Although cases involving computers are not sui generis, the law of computers is fast evolving, and we are reluctant to recognize a retroactive right based on cases involving footlockers and other dissimilar objects. Thus, a reasonable officer in the Defendants' position would not have known that Conrad's consent did not authorize them to search Trulock's files; the Defendants are, therefore, entitled to qualified immunity.[6]
 
 D.
 
 41
 In his final claim, Trulock alleges that the Defendants trammeled his First Amendment right to free speech by retaliating for his National Review article.[7] The district court dismissed Trulock's claim, holding that "other than the timing of the interrogation and search, the complaint presents no indication that the actions by the Defendants were other than a good faith effort to determine whether classified information was being unlawfully possessed." (J.A. at 43.) We must disagree.
 
 
 42
 The First Amendment guarantees an individual the right to speak freely, including the right to criticize the government and government officials.[8] New York Times v. Sullivan, 376 U.S. 254, 273 (1964); accord Barrett v. Harrington, 130 F.3d 246, 264 (6th Cir. 1997). To protect that right, public officials are prohibited from retaliating against individuals who criticize them. Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000). Fear of retaliation may chill an individual's speech, and, therefore, permit the government to "`produce a result which [it] could not command directly.'" Perry v. Sinderman, 408 U.S. 593, 597 (1972) (alterations in original)(citation omitted); ACLU v. Wicomico County, Md., 999 F.2d 780, 785 (4th Cir. 1993).
 
 
 43
 To establish a First Amendment retaliation claim, a plaintiff must prove three elements: (i) that his speech was protected; (ii) that the defendant's alleged retaliatory action adversely affected his constitutionally protected speech; and (iii) that a causal relationship existed between his speech and the defendant's retaliatory action. Suarez, 202 F.3d at 685-86.
 
 
 44
 In count two of the complaint, Trulock alleges that the Defendants retaliated against him for publishing the critical article. The Defendants argue that dismissal was justified because: (i) the complaint does not allege facts which, if proven, would show the causal relationship between Trulock's speech and the Defendants' actions; and (ii) the Defendants are entitled to qualified immunity.
 
 
 45
 Ordinarily, a complaint should not be dismissed for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) unless it appears beyond all doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. See Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Labram v. Havel, 43 F.3d 918, 920 (4th Cir. 1995). Under the motion to dismiss standard, factual allegations, once plead, must be accepted as true. See Jenkins v. McKeithen, 395 U.S. 411, 421-22 (1969).
 
 
 46
 The liberal pleading requirements of Rule 8(a) demand only a "short and plain" statement of the claim. A plaintiff often must offer more detail, however, than the bald statement that he has a valid claim of some type against the defendant. Migdal v. Rowe Price-Fleming Int'l, 248 F.3d 321, 326 (4th Cir. 2001).[9] Although there is no heightened pleading standard in qualified immunity cases, a district court has the discretion to ask a plaintiff to "put forward specific, nonconclusory factual allegations that establish improper motive." CrawfordEl v. Britton, 523 U.S. 574, 598 (1998).
 
 
 47
 Whether Trulock's claim can survive a motion for summary judgment remains to be seen, but we find that Trulock has alleged sufficient facts in support of his retaliation claim to withstand a motion to dismiss and proceed to discovery. The complaint contains facts that bolster Trulock's claim of improper motive. First, the timing of the search raises an inference of retaliatory motive. Stever v. Independent School District No. 625, 943 F.2d 845, 852 (8th Cir. 1991). The article was published in early July 2000 and the search occurred on July 14, 2000. The article chastised the White House, the CIA, the DOE, and the FBI, the very agency that executed the search. According to the Plaintiffs, a criminal referral is necessary for the FBI to commence an official investigation. The complaint alleges, however, that the FBI initiated the investigation without receiving a criminal referral from the DOE. Sanchez told Conrad, on behalf of the FBI, that there was a search warrant when there was none. Finally, two weeks after the incident, Sanchez told Conrad that if she initiated a lawsuit, Sanchez, to protect the "Bureau," would deny telling Conrad that the FBI claimed to have a search warrant. All of these factors, when viewed together and accepted as true, raise a reasonable inference that the interrogation and search were retaliatory. We cannot conclude beyond all doubt that Trulock can prove no set of facts in support of his claim that would entitle him to relief.
 
 
 48
 Having found that Trulock alleged the violation of a constitutional right, we must next address the Defendants' claim of qualified immunity. It is well established that a public official may not misuse his power to retaliate against an individual for the exercise of a valid constitutional right. Suarez v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000); accord Block v. Ribar, 156 F.3d 673, 678 (6th Cir. 1998).[10] This holds true even when the act of the public official, absent the retaliatory motive, would otherwise have been proper. ACLU, 999 F.2d at 785. Thus, we hold that it was clearly established at the time of the search that the First Amendment prohibits an officer from retaliating against an individual for speaking critically of the government.
 
 
 49
 Finally, we turn to whether a reasonable officer would have known that retaliatory conduct was impermissible. The Defendants make only one contention on this issue. They argue that a reasonable officer could have believed that the magazine article, because of its content, did not enjoy First Amendment protection. The Defendants' effort to support this argument is half-hearted at best. They have not placed the article on the record. They have not stated why the contents would lack First Amendment protection. They have made no effort to show that a prudent officer of the FBI could reasonably have believed that the article did not enjoy First Amendment protection. Simply put, Defendants have done nothing more than offer their bald assertions that they are entitled to qualified immunity. Accordingly, we remand the case to the district court to proceed on the retaliation claim.
 
 IV.
 
 50
 For the reasons stated herein, we vacate that portion of the district court's order that dismissed Trulock's First Amendment retaliation claim and remand for further proceedings consistent with this opinion.
 
 
 51
 AFFIRMED IN PART, VACATED IN PART, AND REMANDED
 
 
 
 Notes:
 
 
 [1]
 Under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), an individual may bring a civil suit against a federal officer for damages stemming from a constitutional violation.
 
 
 [2]
 The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." Not all interaction between a police officer and an individual, however, results in a "seizure" in violation of the Fourth Amendment. Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968).
 
 
 [3]
 The complaint alleges that Sanchez made the statement on behalf of the FBI but does not state the basis for this knowledge. Nevertheless, because we are operating under the motion to dismiss standard, we must accept this allegation as true.
 
 
 [4]
 In criminal cases, the burden is on the Government to prove the voluntariness of an individual's consent. Schneckloth, 412 U.S. at 222. The circuit courts are not in agreement about which party bears the burden of proof in a civil suit that alleges a constitutional violation based on involuntary consent. Compare Valance v. Wisel, 110 F.3d 1269, 1278-79 (7th Cir. 1991) (burden on plaintiff to prove that consent is involuntary), and Larez v. Holcomb, 16 F.3d 1513, 1517-18 (9th Cir. 1994) (burden on plaintiff), and Ruggiero v. Krzeminski, 928 F.2d 558, 562-63 (2nd Cir. 1991) (burden on plaintiff), and Crowder v. Sinyard, 884 F.2d 804, 824-26 (5th Cir. 1989) (burden on plaintiff), with Tarter v. Raybuck, 742 F.2d 977, 980-81 (6th Cir. 1984) (burden on defendant). Given the posture of this case, however, we need not decide this issue.
 
 
 [5]
 According to the allegations in the complaint, Agent Carr and the unidentified computer specialist were the only Defendants directly involved in the search and seizure of Trulock's password-protected files. Although Agent Halpin was present at the townhouse, the complaint does not allege that he participated in the search. Furthermore, there is no allegation that the supervising Defendants (Freeh, Gallagher, and Dillard) either ordered the search of the files or knew about the passwordprotection.
 
 
 [6]
 As previously stated, the complaint does not allege that the agents knew of Sanchez's statement about a warrant. They had no reason, therefore, to believe that Conrad's consent was anything but voluntary.
 
 
 [7]
 It should be noted that the article itself is not part of the record. We know only that it was highly critical of the FBI and other departments of the federal government.
 
 
 [8]
 The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech."
 
 
 [9]
 "The presence [ ] of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6) when the facts alleged in the complaint" do not support the legal conclusion. Young v. City of Mount Ranier, 238 F.3d 567, 577 (4th Cir. 2001) (dismissing Fourteenth Amendment claim where complaint alleged "deliberate indifference" but included no facts to support allegation).
 
 
 [10]
 "[G]overnment officials in general, and police officers in particular, may not exercise their authority for personal motives, particularly in response to real or perceived slights to their dignity. Surely anyone who takes an oath of office knows -or should know -that much." Duran v. City of Douglas, 904 F.2d 1372, 1378 (9th Cir. 1990).
 
 
 
 52
 MICHAEL, Circuit Judge, concurring in part and dissenting in part:
 
 
 53
 I dissent from part III.C. of the majority's opinion, but otherwise concur. The owner of password-protected computer files has a clear expectation of privacy in those files that is protected by the Fourth Amendment. Another person who does not know the passwords has no authority to consent to a search of these private files because he lacks the "joint access or control" required by United States v. Matlock, 415 U.S. 164, 171 n.7 (1974). The plaintiffs, Notra Trulock and Linda Conrad, both used Conrad's computer, but each maintained personal files that were protected by passwords. Conrad told the defendant-FBI agents that she did not know either the passwords for Trulock's files or the contents of those files. As a result, Conrad's general consent to a search of her computer could not authorize the FBI's warrantless search of Trulock's password-protected files. This should have been abundantly clear to any reasonable law enforcement officer operating in the year 2000. I therefore respectfully dissent from the majority's decision to affirm the grant of qualified immunity to the FBI officials on the search of Trulock's password-protected computer files. On a separate point, I agree with the majority that the officials are entitled to qualified immunity on their warrantless search of Conrad's house, but I write independently to explain why I reach that conclusion.
 
 I.
 
 54
 The majority holds that Conrad lacked the authority to consent to a search of Trulock's password-protected computer files. Ante at 406. I agree. I also agree with the majority's conclusion, see id., that Trulock's computer files are analogous to the locked footlocker in United States v. Block, 590 F.2d 535, 540-42 (4th Cir. 1978) (holding that a mother's consent to the search of her son's room did not extend to his locked footlocker). I respectfully disagree, however, with the majority's view that the defendants are entitled to qualified immunity because there was no clearly established law saying that one co-user's consent to search a computer does not extend to the passwordprotected files of another co-user when the consenting co-user does not know the other's passwords. I would reject the defendants' qualified immunity defense because the unlawfulness of searching Trulock's password-protected files was readily apparent in light of the principles established in Matlock and reiterated in Block.
 
 
 55
 Qualified immunity shields a government official from civil liability so long as his conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In deciding whether a right is clearly established for qualified immunity purposes, the question is not whether the general right (here, the right to be free from unreasonable searches) is clearly established. Rather, the question is whether the right is clear in relation to the specific conduct being challenged. See Wiley v. Doory, 14 F.3d 993, 995 (4th Cir. 1994). In other words, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). This does not mean, however, that "the very action in question [must have] previously been held unlawful." Id. Liability will attach if the unlawfulness of the conduct would be "apparent" to a reasonable officer "in the light of pre-existing law." Wilson v. Layne, 526 U.S. 603, 615 (1999). For the class of "clearly established" rights "includes not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked." Pritchett v. Alford, 973 F.2d 307, 314 (4th Cir. 1992) (emphasis added).
 
 
 56
 The central question here is whether in the light of pre-existing law it would have been apparent to a reasonable FBI agent that Conrad's general consent to search the computer she shared with Trulock did not authorize the search of Trulock's password-protected files stored in that computer. In answering this question, we look to Supreme Court cases, "`cases of controlling authority in [this] jurisdiction,' [and] the `consensus of cases of persuasive authority' from other jurisdictions" as sources of clearly established law. Amaechi v. West, 237 F.3d 356, 363 (4th Cir. 2001) (quoting Wilson, 526 U.S. at 617). No court has decided a case involving third-party consent to the search of password-protected computer files. Nevertheless, we have clearly established law that is applicable: it comes from Matlock and Block.
 
 
 57
 A warrantless search can sometimes be authorized by a third party who is not the target of the search. Matlock established that thirdparty consent is valid only when the third party and the target have "common authority" over the area or item sought to be searched. Matlock, 415 U.S. at 171. Common authority, the Supreme Court explained, rests on "mutual use of the property by persons generally having joint access or control for most purposes." Id. at 171 n.7, 94 S. Ct. 988. When common authority exists, the target of a search has "assumed the risk" that another person with authority over a shared area or item might consent to a search. Id. The principle that valid third-party consent requires common authority should be sufficient to defeat the defendants' claims of qualified immunity in this case. Specifically, it should have been obvious to law enforcement officials operating in the year 2000 that common authority over password-protected computer files requires knowledge of the passwords.[1] Even so, the government argues that because Conrad had common authority over the computer she shared with Trulock, the defendant-FBI agents reasonably failed to understand that her general consent to search the computer did not authorize the search of all files stored in the computer. The government's argument fails because a reasonable officer who understood our decision in Block would have known that the search of Trulock's private files was unlawful.
 
 
 58
 In Block we applied Matlock in deciding whether a third party's consent to the search of a general area over which she has common authority validates the search of every item within that area. The mother in Block had general access to the room in which her defendant-son's footlocker was located, and she signed a written consent form authorizing a "complete search" of her son's room. Block, 590 F.2d at 537 n.1. Nevertheless, we held that the mother's consent did not authorize the search of her son's footlocker. We emphasized that authority to consent to the search of a general area "cannot be thought automatically to extend to the interiors of every discrete enclosed space capable of search within the area." Id. at 541. An enclosed space or distinct item requires independent consent for a search when the circumstances indicate that the person targeted has "a discrete expectation of privacy with respect to the particular [space or item]." Id. at 541 n.8. Privacy expectations are signaled, for example, when the space or item is secured or "is commonly used for preserving privacy." Id. This means, in other words, that a third party's common authority ends where the target's discrete expectation of privacy begins. In sum, Block announced the general principle that when a third party and the target of a search have common authority over a general area, the third party's consent to a search of the general area does not authorize the search of a specific item within that area if the circumstances indicate that the target has a discrete expectation of privacy with respect to that item. This principle dictates the result in this case.
 
 
 59
 The majority readily agrees that "Trulock's password-protected files are analogous to the locked footlocker inside the bedroom" in Block and that Trulock has therefore "alleged a violation of his Fourth Amendment rights." Ante at 403. That conclusion is unassailable because the factual parallels between this case and Block are striking. The mother in Block had common authority over her son's bedroom, just as Conrad had common authority over the computer she shared with Trulock. The mother gave consent to search the bedroom, just as Conrad gave consent to search the computer. The mother told the police that the footlocker belonged to her son, that he kept it locked, and that she did not have the key. Block, 590 F.2d at 538. Conrad told the FBI agents that she did not know what information Trulock kept in his computer files and that she could not access those files because she did not know the passwords. Just as the mother's consent to the search of her son's bedroom did not extend to his locked footlocker inside that room, Conrad's consent to the search of her computer did not extend to Trulock's "locked" files inside that computer. Indeed, the only notable difference between the two cases is that Block involved a locked footlocker and this case involves passwordprotected computer files. For the majority, however, the immunity decision turns on this one difference. The majority gives qualified immunity to the defendants because of its reluctance to "recognize a retroactive right based on cases involving footlockers and other dissimilar objects." Ante at 404. In essence, the majority is hesitant to hold the FBI agents responsible for applying Block 's clearly established legal principle in a different factual context. The agents, the majority believes, could not be expected to understand that the expectations of privacy signaled by a locked footlocker and a password-protected computer file are essentially the same.
 
 
 60
 While it is true that knowing a legal principle and knowing whether to apply it in a particular circumstance are two different things, see Lappe v. Loeffelholz, 815 F.2d 1173, 1180 n.7 (8th Cir. 1987), qualified immunity was never intended to relieve government officials from the responsibility of applying familiar legal principles to new situations. To say otherwise would ignore the Supreme Court's warning that liability under S 1983 (and Bivens) does not require "the very action in question [to have] previously been held unlawful." Wilson, 526 U.S. at 615. Whatever the physical differences between locked footlockers and password-protected computer files, the question here must be whether a reasonable officer would believe that there is a legal difference for Fourth Amendment purposes. In other words, is there any reason why a reasonable FBI agent fully apprised of the principles in Block would believe that he could lawfully search Trulock's password-protected files on the basis of Conrad's general consent to search the computer? If there is no such reason, the unlawfulness of the agents' conduct in this case is "apparent," Wilson, 526 U.S. at 615, and qualified immunity does not apply. Cf. Lassiter v. Alabama A&M; University, 28 F.3d 1146, 1150 (11th Cir. 1994) (stating that qualified immunity is lost when pre-existing law "dictate[s]" or "compel[s]" the conclusion that a defendant's conduct violates federal rights).
 
 
 61
 Any reasonable officer should have recognized that the privacy expectations attaching to a password-protected computer file are essentially the same as those attaching to a locked footlocker. A computer file is a repository for information and images in electronic form, just as a footlocker is a repository for more tangible items such as papers and other personal effects. Once password protection attaches to a computer file, that protection is the electronic equivalent of the lock on a footlocker containing items that are intended to remain private. The password is an electronic key. While the medium for ensuring privacy is different, the result -a clear signal that privacy is expected against all those who lack the key (or the password) -is the same. There is simply no reason why a reasonable officer who understood that a locked footlocker signals a discrete expectation of privacy would believe that a password-protected computer file does not. The physical differences between the two repositories have no legal significance.
 
 
 62
 This conclusion is not undercut by the majority's observation that the law of computers is "fast evolving." Ante at 403. In fact, the case law supports my point that the differences between computer files and physical repositories of personal information and effects are legally insignificant. Courts have not hesitated to apply established Fourth Amendment principles to computers and computer files, often drawing analogies between computers and physical storage units such as file cabinets and closed containers. See, e.g., In re Grand Jury Subpoena Duces Tecum, 846 F. Supp. 11, 12-13 (S.D.N.Y. 1994) (analogizing computer hard drives and floppy disks that contained electronic documents to file cabinets that contained paper documents in deciding that subpoena for computer-accessible data was unreasonably broad); United States v. Chan, 830 F.Supp. 531, 534-35 (N.D. Cal. 1993) (holding that "[t]he expectation of privacy in an electronic repository for personal data is . . . analogous to that in a personal address book or other repository for such information . . . . [A]n individual has the same expectation of privacy in a pager, computer or other electronic data storage and retrieval device as a closed container. . . .") (internal quotation and citation omitted); United States v. David, 756 F.Supp. 1385, 1390 (D. Nev. 1991) (recognizing that a computer memo book "is indistinguishable from any other closed container, and is entitled to the same Fourth Amendment protection"). Our circuit has also drawn analogies between computer files and physical repositories of personal information and effects, such as lockers. See United States v. Simons, 206 F.3d 392, 398 (4th Cir. 2000) (citing American Postal Workers Union v. United States Postal Serv., 871 F.2d 556, 560 (6th Cir. 1989), to compare employee lockers subject to random inspection under employer policy with computer files subject to "appropriate" inspection under employer policy allowing monitoring of employee Internet use).[2] Thus, neither case law nor common sense suggests any reason for thinking that the principles in Block do not dictate the result in this case.
 
 
 63
 While the majority bases its grant of qualified immunity primarily on the factual differences between this case and Block, it also suggests that there is no clearly established law governing the search of Trulock's protected files because at least one district court opinion from another circuit has upheld the search of a shared computer based on third-party consent. Ante at 403 (citing United States v. Smith, 27 F. Supp.2d 1111 (C.D. Ill. 1998)). Smith, however, is consistent with Block, and its reasoning actually supports the conclusion that Conrad's consent to search the computer did not encompass Trulock's password-protected files.
 
 
 64
 In Smith the court upheld a search of the defendant's computer files based on third-party consent, but the facts were significantly different from those presented here. There, the defendant's housemate consented to a search of the defendant's computer, which was located in an alcove in the housemate's bedroom. The court found that the housemate had the necessary joint control and access to the computer and its surrounding area because the computer was accessible to all members of the household, it had been used by the housemate's daughter, and the defendant had tried to teach the housemate to use it. Smith, 27 F.Supp.2d at 1115-16. Although there was some factual dispute about whether the defendant had used passwords to protect computer files containing images of child pornography, the court found that these files were not password protected. Id. at 1116 ("[I]t is important to note that none of the officers who searched the computer found passwords on the computer. This belies Defendant's claim of exclusive and possessory control and indicates that [the housemate] could consent to the search of the home and computer and that the consent extended to the computer area and the computer itself."). At most, then, Smith stands for the proposition that a third party with shared access to a computer may consent to the search of all the files on the computer that are not protected by individualized passwords. Indeed, the court's conclusion that a lack of password protection discredits claims of exclusive possession and control suggests that the presence of such protection would establish exclusive possession and control, thereby placing the password-protected files outside the scope of valid third-party consent. As the majority recognizes, Smith held only that "a third party may consent to the search of a shared computer when the third party has complete access to the computer." Ante at 403. Certainly Conrad had general access to the computer, and certainly a reasonable officer would have believed that Conrad had the authority to consent to a search of all of the commonly accessible files on the computer. But access to a computer need not -and here it did not -extend to each and every file on that computer. A reasonable officer aware of the principles in Block would not have thought otherwise.
 
 
 65
 I would hold, therefore, that the search of Trulock's passwordprotected files violated clearly established law because the unconstitutionality of the search was readily apparent in light of the core principles applied in Matlock and Block. This position is supported by the government's own conclusions about how Fourth Amendment principles apply to computer technology. In a manual designed to educate federal agents about the law governing searches and seizures of computers, the Department of Justice (DOJ) explicitly acknowledges that "it appears likely that encryption and password-protection would in most cases indicate the absence of common authority to consent to a search among co-users who do not know the password or possess the encryption key." Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations, at p. 14 (2001), available at www.cybercrime.gov/searchmanual.pdf.[3] It is especially striking that the DOJ based its conclusion on an analysis of Block and Smith, see id., the very authorities relied upon by the majority to assert that there was no clearly established law indicating that Conrad had no authority to consent to the search of Trulock's passwordprotected files. In effect, the government now invites this court to find that the law governing third-party consent to computer searches is uncertain even though it has shown itself quite capable of correctly resolving the question presented in this case. I would decline this invitation.
 
 
 66
 Qualified immunity is intended "to protect those officers who reasonably believe that their actions do not violate federal law," Doe v. Broderick, 225 F.3d 440, 453 (4th Cir. 2000), but it should not function to give officers "one free violation" of constitutional rights every time they are asked to apply a well-established principle to a new set of facts, Wilson, 526 U.S. at 625 (Stevens, J., concurring in part and dissenting in part). The defendants in this case should have known that they had no right to search Trulock's password-protected computer files, and thus they should not be given qualified immunity.
 
 II.
 
 67
 In part III.B. of its opinion the majority concludes that although Conrad did not voluntarily consent to the search of her house, the defendants are entitled to qualified immunity from any liability for that search. While I agree with the majority's conclusion, I write separately because my reasons for granting the defendants qualified immunity on the house search may differ from the majority's.
 
 
 68
 Although Conrad signed a written consent form authorizing the FBI to search her house, she alleges that this consent was involuntary because it was prompted by her belief that the FBI already had a search warrant and that the FBI would break down her front door and search the house in the presence of the media and local police if she refused to cooperate. Although the voluntariness of consent for Fourth Amendment purposes is "a question of fact to be determined from the totality of all the circumstances," Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973), one factor that nearly always invalidates consent is an assertion by law enforcement officers that they have the authority to search with or without consent. See, e.g., Bumper v. North Carolina, 391 U.S. 543, 550 (1968) (holding that consent was invalid when given after police officers claimed authority to search home under a warrant); United States v. Lattimore, 87 F.3d 647, 652 (4th Cir. 1996) (en banc) (stating that police officer's assertion that he would "`call a drug dog'" to search suspect's car if suspect refused consent "would raise serious questions concerning the voluntariness of his consent"); Orhorhaghe v. I.N.S., 38 F.3d 488, 500 (9th Cir. 1994) (stating that "[i]t is well established that there can be no effective consent to a search or seizure if that consent follows a law enforcement officer's assertion of an independent right to engage in such conduct."). Consent is also involuntary when officers threaten a person with adverse consequences if she refuses to consent to a search. See State v. Davis, 404 S.E.2d 100, 100-01 (Ga. 1991) (affirming trial court's ruling that consent was involuntary when police told defendant's mother they would break down the door if she refused to cooperate); Reyes v. Edmunds, 472 F. Supp. 1218, 1227-28 (D. Minn. 1979) (holding that consent was involuntary when welfare recipient was told that her benefits would be terminated if she refused to consent to the search of her home). Here, Conrad alleges that the FBI, acting through Lawrence Sanchez (Conrad's supervisor at the Department of Energy), claimed to have authority to search her house and threatened her with property damage and public humiliation if she refused to cooperate. Under these circumstances, her consent was not voluntary.
 
 
 69
 The government claims that there are two reasons why this case is not controlled by Bumper, in which the Supreme Court held that consent is involuntary when given after "the official conducting the search has asserted that he possesses a warrant." Bumper, 391 U.S. at 548. First, it argues that this case is distinguishable from Bumper because the complaint fails to allege that the FBI agents who conducted the search claimed they had a warrant or knew that Sanchez had told Conrad that they had a warrant. Second, the government argues that because Sanchez is neither a defendant nor a law enforcement official, what he allegedly said to Conrad does not bear on whether the defendants violated her constitutional rights. Like the majority, I refuse to read Bumper so narrowly. Bumper stands for the proposition that consent cannot be voluntary when the government has led the person consenting to "erroneous[ly] belie[ve] that [s]he cannot protect [her] privacy by refusing to give consent." 3 Wayne R. LaFave, Search and Seizure, S 8.2(c) at 652 (3rd ed. 1996). If, as the complaint alleges, Sanchez was acting on behalf of the FBI, then the government led Conrad to believe that her only choice was between losing her privacy quietly and losing it in the glare of the media spotlight. That the government conveyed this message through Sanchez rather than through the FBI agents conducting the search does not change the result under Bumper.
 
 
 70
 The majority and I may differ, however, in our reasons for concluding that the defendants are entitled to qualified immunity on the house search. Qualified immunity protects government officials who make reasonable mistakes of fact as well as those who make reasonable mistakes about what the law requires in a particular situation. Karnes v. Skrutski, 62 F.3d 485, 498 (3rd Cir. 1995) (stating that qualified immunity protects those who make "`mere mistakes in judgment, whether the mistake is one of fact or one of law'" (quoting Butz v. Economou, 438 U.S. 478, 507 (1978))). As my previous discussion of the search of Trulock's computer files illustrates, qualified immunity analysis usually turns on whether the illegality of the defendant's conduct was apparent in the light of clearly established law. Here, however, I believe the defendants are entitled to qualified immunity only because it is undisputed that they did not know all of the relevant facts. Because the complaint fails to allege either that the defendants told Conrad that they had a warrant or that they knew Sanchez had told Conrad that they had a warrant, we must assume that the defendants were unaware of Conrad's belief that they would search her house with or without her consent. Without any awareness of what Sanchez had said to Conrad, the defendants could have reasonably believed that Conrad's written consent was valid. The defendants are therefore entitled to qualified immunity. On my analysis, then, the crucial factor in explaining why the defendants should receive qualified immunity is that they made a reasonable mistake of fact about what Conrad believed. Because the defendants did not know what Sanchez had told Conrad, they reasonably failed to recognize that Conrad believed that she could no longer protect her privacy by refusing to consent to the search of her house.
 
 
 71
 In explaining its qualified immunity holding, the majority also emphasizes the defendants' lack of knowledge of the conversation between Sanchez and Conrad. Thus, the majority and I may agree that qualified immunity is justified only because the defendants made a reasonable mistake of fact. I wish to be explicit on the point, however, because I could not accept the proposition that the defendants in this case made a reasonable mistake of law. Specifically, I would refuse to grant the defendants qualified immunity if the complaint had alleged that any of the defendants had personally directed Sanchez to threaten Conrad or that the defendants knew that Sanchez had conveyed threats to Conrad at the behest of someone in the FBI. On those facts, the defendants' only argument for qualified immunity would have been that the invalidity of Conrad's consent was not readily apparent in light of the factual distinctions between this case and Bumper. For example, the government might have argued that this case differs from Bumper because there the officers who claimed to possess a warrant also conducted the search, whereas here Sanchez claimed that the FBI had a warrant but the agents who conducted the search did not make that claim. I would reject such arguments for reasons similar to those given in part I above. Bumper clearly establishes that there can be no valid consent when the government has led a person to believe that her consent is irrelevant, and there is no reason why a reasonable officer would think that the factual differences between Bumper and this case are legally significant.
 
 III.
 
 72
 In sum, I agree with the majority's disposition of this case, except that I respectfully dissent from its decision to grant the defendants qualified immunity on Trulock's claim that the warrantless search of his password-protected computer files violated his Fourth Amendment rights. I would therefore reverse the district court's order granting the defendants' motion to dismiss that claim.
 
 
 
 Notes:
 
 
 [1]
 Knowledge of the passwords is necessary, but not sufficient, to establish common authority over password-protected files. The third party must also have "joint access" to the files "for most purposes." Matlock, 415 U.S. at 171 n.7. If Conrad had known Trulock's passwords and had enjoyed general access to his files, this would be a different case.
 
 
 [2]
 These analogies have limitations, of course. For example, the Tenth Circuit rejected an argument based on the file cabinet analogy in deciding that a detective exceeded the scope of a search warrant when he opened certain of the defendant's computer files. See United States v. Carey, 172 F.3d 1268 (10th Cir. 1999). In Carey the government argued that an officer with a warrant to search a file cabinet for files containing certain information can open every drawer of the file cabinet, even when the labels on the file drawers suggest that none of the files within that drawer fall within the scope of the warrant. Opening every drawer, the government insisted, is the only way to be sure that the labels on the file drawer are accurate. The government then argued by analogy that an officer executing a warrant to search files on a computer for specified information can also open all of the computer's files, including those files whose names suggest that they contain no information within the scope of the warrant. See id. at 1274-75. The court held that the file cabinet analogy does not extend this far because in the case of a computer, officers may use key word searches and similar techniques to identify which files fall within the scope of a warrant without the need to open all of the files in the computer. See id. at 1275-76; see also Raphael Winick, Searches and Seizures of Computers and Computer Data, 8 Harv. J. L. & Tech. 75, 103-11 (1994) (discussing the limitations of the closed container analogy and recommending that courts adopt a version of the "intermingled documents" rule adopted in United States v. Tamura, 694 F.2d 591, 595-96 (9th Cir. 1982), to govern computer searches). The Carey court's limitation on the file cabinet analogy makes sense because the court relied on a feature of computer files unique to the electronic medium, namely, their amenability to key word searches and similar techniques. The detective's failure to use these techniques to limit the scope of his computer search made the search unreasonable. See Carey, 172 F.3d at 1276. Thus, the physical differences between computer files and file cabinets made a legal difference in Carey, and the court properly warned the uncritical acceptance of the file cabinet analogy could lead courts to sanction indiscriminate searches of computer files. Nevertheless, no court to my knowledge has suggested that the differences between computer files and other repositories for personal information raise difficult problems in deciding whether a given repository signals a "discrete expectation of privacy." Block, 590 F.2d at 541 n.8.
 
 
 [3]
 On this point, the contrast with Wilson v. Layne is instructive. There, the Supreme Court buttressed its finding of qualified immunity by stating that the police reasonably relied on a U.S. Marshals Service policy governing media ride-alongs which clearly contemplated that media members might accompany police into private homes. See Wilson, 526 U.S. at 617. In contrast, the agents' conduct here contravened the DOJ's own understanding of the legal norms governing third-party consent to computer searches.