Zelma BOGGESS, Plaintiff,

v.

HOUSING AUTHORITY OF THE CITY OF CHARLESTON, d/b/a Charleston Housing, a body corporate and politic, et al., Defendants.

No. CIV.A. 2:02–0484.

United States District Court,
S.D. West Virginia,
at Charleston.

July 25, 2003.

Barbara G. Arnold, MacCorkle, Lavender, Casey & Sweeney, PLLC, Charleston, Counsel for Plaintiff.

Ricklin Brown, Rochelle Lantz Glover, Bowles Rice McDavid Graff & Love PLLC, Charleston, Counsel for Defendants.

## MEMORANDUM OPINION AND ORDER

STANLEY, United States Magistrate Judge.

Currently pending before the court is the Amended Motion for Summary Judgment on behalf of Defendants with Regard to Counts I, III, IV, VI and VIII of Plaintiff's Complaint and the Defendants' Individual Liability, filed April 11, 2003. (Docket Sheet Document # 54.) The parties have responded (# 90) and replied (# 102) and, with leave of court, Plaintiff filed a surreply as well (# 106). Pursuant to 28 U.S.C. § 636(c)(1), the District Court, upon consent of the parties, designated the undersigned to conduct all proceedings in this matter. (# 16.)

*A. Background/Facts.*

Defendant, the Housing Authority of the City of Charleston ("CHA") is a "public body corporate and politic" pursuant to West Virginia Code § 16–15–3(a) (2001). Pursuant to West Virginia Code § 16–15–3(d), five commissioners, who receive no compensation for their services, are appointed by the mayor. In turn, West Virginia Code § 16–15–5 provides that the commissioners "shall, from time to time, select and appoint such officers and employees, including engineering, architectural and legal assistants, as they may require for the performance of their duties, and shall prescribe the duties and compensation of each officer and employee."

The CHA Board of Commissioners (the "Board") hired Plaintiff Zelma D. Boggess as Executive Director of CHA on October 7, 1991. (Complaint (# 1), ¶ 4; Memorandum in Support of Amended Motion for Summary Judgment on Behalf of Defendants with regard to Counts I, III, IV, VI and VIII of Plaintiff's Complaint and the Defendants' Individual Liability (# 56), p. 2.) The Board and Plaintiff entered into an

Employment Agreement (the "Agreement") on May 26, 1998. (# 56, Exhibit B (Employment Agreement).) At this time, only Defendants Michael L. Comer and Marie L. Prezioso were Commissioners. (# 56, Exhibit A (Portions of January 28, 2003, deposition of Plaintiff), p. 101.) The term of the Agreement was defined as follows:

The initial term of this Agreement shall be for five years from the date of this Agreement. For the purposes of the Agreement, the initial five year term of this Agreement shall be deemed to have begun June 22, 1998.

Unless either Director or the Authority shall give written notice to the other that this Agreement is terminated at least thirty days prior to the next "annual meeting" of the Board of Commissioners, then the term of this Agreement shall automatically be extended one additional year to the next "annual meeting" date as defined herein. If notice of termination is given, it will not alter or shorten the then existing term of this Agreement, but shall only prohibit the automatic one-year extension. It is the intention of the parties that this provision shall operate as an "automatic extension clause" so that the contract will automatically be extended for one additional year as of each annual meeting date so that as of each annual meeting, the contract (if not earlier terminated by notice of either party as described herein) shall always have a remaining five year term.

(# 56, Exhibit B, p. 2.)

The Agreement further provides that [t]he Authority may terminate the employment of the Director upon the following grounds: (1) serious or repeated failure on the part of the Director to comply with Authority policy; (2) failure by the Director, without good cause, to comply with any lawful decision or di-

rective of the Authority; (3) for activities on the part of the Director constituting misfeasance or malfeasance; or (4) for any other just cause, in accordance with applicable state or federal law.

(# 56, Exhibit B, p. 3.)

In May of 2000, the relationship between Plaintiff and the Board, now comprised of Defendants Comer and Prezioso and Defendants Richard P. Cooke, Vernadine L. Crothers and Katherine L. Dooley took a negative turn. (# 56, Exhibit A, pp. 101, 134–35.) At a retreat/planning meeting on September 1, 2000, the Board asked Plaintiff to resign as Executive Director. (# 56, Exhibit A, p. 175.) In response, Plaintiff requested that CHA buy her out of the Agreement for a certain sum. (# 56, Exhibit A, pp. 175–77.) Plaintiff's counsel at the time, Cynthia Evans, Esquire, eventually wrote a letter to Defendant Prezioso stating that Plaintiff would resign for the amount she believed was due her under the Agreement or $674,660.05, along with the use of a vehicle for five years and payment of the insurance premiums on the vehicle. (# 56, Exhibit C (Letter from Cynthia Evans to Defendant Prezioso dated October 16, 2000).)

Plaintiff continued in her position as Executive Director. (# 56, Exhibit A, p. 177.) On March 26, 2001, the Board voted not to extend the term of the Agreement. (# 56, Exhibit D (Letter from Defendant Prezioso to Plaintiff dated April 11, 2001).) In Defendant Prezioso's letter of April 11, 2001, Defendant Prezioso also provided a bill of particulars related to Plaintiff's unsuccessful performance as Executive Director. (# 56, Exhibit D.) On May 29, 2001, the Board met in executive session and following the executive session, unanimously voted to place Plaintiff on administrative leave with pay and benefits for a

period of 90 days. (# 56, Exhibit E (Minutes of May 29, 2001, Board Meeting).)

On or about May 29, 2001, Defendant Crothers and others filed an action in the Circuit Court of Kanawha County against Plaintiff in her individual and official capacities, and others, alleging fraud, forgery, racial discrimination and retaliatory evictions in violation of the West Virginia Constitution and West Virginia law. Plaintiff removed the action, but the District Court later remanded the case to State court. (*See Crothers, et al. v. Boggess, et al.,* Civil Action Number 2:01–0814, Docket Sheet Document 1, 43, 44.)

The Board hired the consulting firm of Goodwin And Associates to assess the operations of CHA and issue a report. (# 56, Exhibit F (Operational Assessment of the Housing Authority of the City of Charleston).) Goodwin And Associates issued an Operational Assessment of the Housing Authority of the City of Charleston on August 17, 2001. (# 56, Exhibit F.) At a Board meeting on August 27, 2001, the Board went into executive session to discuss personnel matters. Thereafter, Defendant Cooke made a motion to terminate Plaintiff's employment pursuant to paragraph 2(c) of the Agreement because of Plaintiff's failure to comply with CHA policy, directives of the Board and additional matters, and the motion was seconded by Defendant Dooley. Four Commissioners (Prezioso, Cooke, Dooley and Comer) voted to terminate Plaintiff, while Defendant Crothers abstained from voting. (# 56, Exhibit G (Minutes of August 27, 2001, Board Meeting).) By letter dated September 21, 2001, counsel for CHA, Charles W. Peoples, Jr., wrote Plaintiff outlining the factors upon which the Board's termination decision was based. (# 56, Exhibit H (Letter from Charles W. Peoples, Jr. to Plaintiff dated September 21, 2001).)

B. *Summary Judgment Standard.*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). Pursuant to Rule 56(c), a district court must enter judgment against a party who, "after adequate time for discovery ... fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Stated differently, "[t]o prevail on a motion for summary judgment, [the moving party] must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) it is entitled to judgment as a matter of law." *Harleysville Mut. Ins. Co. v. Packer,* 60 F.3d 1116, 1119–20 (4th Cir. 1995) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In determining whether a genuine issue of material fact has been raised, the court

must construe all inferences in favor of the [nonmoving party]. If, however, the evidence is so one-sided that one party must prevail as a matter of law, we must affirm the grant of summary judgment in that party's favor. The [nonmoving party] "cannot create a genuine issue of fact through mere speculation or the building of one inference upon another[.]" To survive [the summary judgment] motion, the [nonmoving party] may not rest on their pleadings, but must demonstrate that specific, material facts exist that give rise to a genuine

issue. [T]he "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff[.]" *Harleysville*, 60 F.3d at 1120 (citations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted).

"At bottom, the district court must determine whether the party opposing the motion for summary judgment has presented genuinely disputed facts which remain to be tried. If not, the district court may resolve the legal questions between the parties as a matter of law and enter judgment accordingly." *Thompson Everett, Inc. v. National Cable Adver., L.P.*, 57 F.3d 1317, 1323 (4th Cir.1995).

C. *Counts I, III, IV, VI and VIII as to all Defendants.*

1. *Count III—Breach of Express Employment Contract.*

a. *Agreement Violates State Law.*

■ Defendants rely on three decisions of the West Virginia Supreme Court of Appeals in support of their argument that they are entitled to summary judgment as to Count III because the Agreement between CHA and Plaintiff is void. In *Williams v. Brown*, 190 W.Va. 202, 437 S.E.2d 775 (1993), an assistant attorney general was fired by a newly elected Attorney General and thereafter filed suit alleging breach of an implied employment contract. On certified question from the circuit court, the Supreme Court of Appeals of West Virginia determined that West Virginia Code § 5–3–3 makes assistant attorneys general at-will employees who may be discharged for no reason at all. Relying on *Barbor v. County Court*, 85 W.Va. 359, 101 S.E. 721 (1920), the West Virginia Supreme Court in *Williams* held that because West Virginia Code § 5–3–3 (1961) includes the phrase "[a]ll assistant attorneys general so appointed shall serve at the pleasure of the attorney general," employment as an assistant attorney general is at-will and allows for termination at any time with or without cause. *Williams*, 437 S.E.2d at 778–80. In addition, the West Virginia Supreme Court stated that its earlier decision in *State ex rel. Archer v. County Court*, 150 W.Va. 260, 144 S.E.2d 791 (1965) "would permit the removal of an assistant attorney general even if the word 'pleasure' was not found in W. Va.Code, 5–3–3, because this section authorizes the Attorney General to appoint assistant attorneys general and provides no set term for their employment." *Williams*, 437 S.E.2d at 779.

The statute which authorizes CHA to select and appoint officers and employees, West Virginia Code § 16–15–5 (2001), provides as follows:

As soon as possible after the establishment of an authority the commissioners shall organize for the transaction of business by choosing from among their number a chairmen and a vice-chairmen and by adopting bylaws and rules and regulations suitable to the purposes of this article. Three commissioners shall constitute a quorum for the purpose of organizing the authority and conducting the business thereof. The commissioners shall, from time to time, select and appoint such officers and employees, including engineering, architectural and legal assistants, as they may require for the performance of their duties, and shall prescribe the duties and compensation of each officer and employee.

Defendants acknowledge the absence from West Virginia Code § 16–15–5 of the "at the pleasure of" language contained in

*Williams.* However, Defendants assert that the presence of this language is not essential pursuant to *Williams* and *Archer.* Defendants argue that based on *Williams* and *Archer,* because West Virginia Code § 16–15–5, the statute under which CHA derived its authority to hire Plaintiff as Executive Director, does not specify fixed terms for such officers and employees, the Board possesses an implied at-will removal power with regard to Plaintiff. (# 56, pp. 8–9.)

■ Defendants assert that the Agreement between CHA and Plaintiff is void because as the West Virginia Supreme Court concluded in *Williams,* "when the appointing authority has the power of removal, this removal right may not be 'contracted away so as to bind the appointing body to retain [the employee] in such position for a definite fixed period.'" *Williams,* 437 S.E.2d at 779 (quoting *Barbor,* 85 W.Va. 359, 101 S.E. 721, Syllabus Point 4). Thus, Defendants contend that because the Agreement between Plaintiff and CHA provided for a rolling five-year term of employment and limited the Board's ability to discharge Plaintiff, the Agreement is void under State law. (# 56, pp. 8–10.)

Finally, in a footnote, Defendants argue that the Agreement may also violate West Virginia Code § 6–6–8, the statute at issue in *Barbor* and *Archer.* Defendants acknowledge that West Virginia Code § 6–6–8 applies only if Plaintiff is considered an officer, not an employee. Defendants do not specifically assert or provide evidence in their memorandum in support of the Amended Motion for Summary Judgment that Plaintiff was an officer of CHA. (# 56, p. 10 n. 1.)

In her response, Plaintiff initially asserts that she was a public employee rather than an officer. Plaintiff, citing *Christopher v. City of Fairmont,* 167 W.Va. 710, 280 S.E.2d 284, 285 (1981), argues that

both the Agreement and the job description attached to the Agreement show that the Executive Director was subject to the direction, decisions and policies of the CHA Board. The position of the Executive Director is not specified by statute or in the City Charter. (Plaintiff's Response to Defendants' Amended Motion for Summary Judgment (# 90), p. 5.) Plaintiff asserts that "[h]aving shown that the Housing Authority's Executive Director was a public employee, it follows that the plaintiff had both a property interest and a liberty interest in continuation of her public employment." (# 90, p. 5) (citing *Major v. DeFrench,* 169 W.Va. 241, 286 S.E.2d 688 (W.Va.1982)).

Plaintiff further argues that the three cases relied upon by Defendants neither apply to nor interpret the statute that controls CHA. (# 90, pp. 7–9, 11–12.) Plaintiff points out that West Virginia Code § 16–15–5 does not include the pertinent "at the pleasure of" language contained in the statutes interpreted in *Barbor* and *Williams.* (# 90, pp. 7–9.) Plaintiff asserts that in addition to the absence of this essential language, West Virginia Code § 16–5–7(a) (2001) states that CHA shall have "all the powers necessary or convenient to carry out and effectuate the purposes and provisions of this article, including the following powers in addition to others herein granted . . . ." (# 90, p. 7); *see also* W. Va.Code § 16–15–2 (2001) (setting forth the purposes of the article).

Plaintiff argues that the statute at issue in *Archer,* West Virginia Code § 6–6–8, (1) applies to the appointment of public officers as opposed to public employees; and (2) allows for the removal of an officer, but not an employee, with or without cause. Plaintiff acknowledges that while the court in *Archer* discussed other legal principles, "indicating that, generally, a power of re-

moval is implied by a statutory power to appoint public officers, that discussion is not necessary to the holding; and is not the basis for the decision." (# 90, p. 8) (footnote omitted). In addition, Plaintiff notes that the one case discussed by the court in *Archer, Town of Davis v. Filler*, 47 W.Va. 413, 35 S.E. 6 (1900), also involved the removal of a public officer and involved statutory language that the officer, once appointed by the town council, will "continue in office during its pleasure." (# 90, p. 8 n. 1.)

Plaintiff asserts that the language of the statutes at issue in *Barbor, Williams* and *Archer* are "mute testimony to the fact that the Legislature is capable of utilizing plain language. There is no such language at issue here, and defendants must rely upon a hypothetical power that only exists if it is properly implied from the language in the statute." (# 90, p. 9.)

In reply, Defendants argue that the plain language of *Barbor* did not limit its holding to the particular statute at issue in that case. Defendants assert that subsequent cases have applied the implied at-will removal power to cases involving various appointment statutes. (Reply on behalf of Defendants to Plaintiff's Response to Defendants' Amended Motion for Summary Judgment (# 102), pp. 2–4.) Defendants disagree with Plaintiff's assertion that the West Virginia Supreme Court's statement in *Archer* that the implied at-will doctrine would apply even where the statute does not contain the "at the pleasure of" language is mere dicta. Defendants point out that the West Virginia Supreme Court's decision in *Town of Davis*, on which the West Virginia Supreme Court's statements in *Archer* were based, is established precedent. (# 102, p. 5.) Defendants further argue that West Virginia Code § 16–15–5 was enacted in 1932, after the decision in *Town of Davis*, and that it must be presumed that the legislature intended to import the common law principle of the implied at-will removal power into the statute. (# 102, p. 5.)

Finally, Defendants argue that Plaintiff was an officer of CHA and, as such, was subject to the express removal power found in West Virginia Code § 6–6–8. (# 102, pp. 6–7.) Defendants assert that West Virginia Code § 16–15–5 explicitly contemplates that the Board will appoint other officers. In addition, Defendants argue that in the job description describing the executive director's duties (# 90, Exhibit A), the executive director is described as "the Chief Executive Officer in overseeing the administration of the agency ... [who has] broad latitude for independent action ... [and is] responsible for executing the policies." (# 90, Exhibit A.) Defendants cite to testimony from Plaintiff as support for the assertion that she was an officer rather than an employee, including her testimony about setting up a home office with CHA equipment, transferring a legal services contract and discharging an employee without CHA Board approval. (# 102, p. 7; # 90, Exhibit B.)

Plaintiff raises a number of arguments as to why the above line of cases related to the implied at-will removal power is inapplicable and/or unpersuasive. As Plaintiff points out, the statutes at issue in *Town of Davis, Barbor, Archer* and *Williams* contain the "at the pleasure of" or similar language absent from West Virginia Code § 16–15–5. *Town of Davis*, 35 S.E. at 7 (West Virginia Code, Chapter 47, § 15 (1891) provided that a superintendent of roads, streets and alleys shall be appointed by council "to continue in office during its pleasure."); *Barbor*, 101 S.E. at 722 (West Virginia Code, Chapter 46, § 23 (1918) provided that "[e]very officer or other person appointed or employed by the county court under the provisions of this chapter, shall hold his office or appointment at its

pleasure ...." (current version at W. Va. Code § 6–6–8 (1931))); *Archer,* 144 S.E.2d at 794 (West Virginia Code § 6–6–8 (1931) provides "that the court, board, body or officer authorized by law to appoint any person to any county, magisterial district, independent school district, or municipal office, the term or tenure of which is not fixed by law, may remove any person appointed to any such office by such court, board, body or officer, with or without cause whenever such removal shall be deemed to be for the good of the public service and such removal from such office shall be final."); *Williams,* 437 S.E.2d at 777 (West Virginia Code § 5–5–3 (1961) states that "[a]ll assistant attorneys general so appointed shall serve at the pleasure of the attorney general and shall perform such duties as he may require of them.")

Despite the absence of the "at the pleasure of" language in West Virginia Code § 16–15–5, the court finds that the implied at-will removal power applies as to officers and employees of CHA pursuant to West Virginia Code § 16–15–5 as an incident to the power of appointment contained therein. As the West Virginia Supreme Court has clearly articulated in *Town of Davis, Archer* and *Williams,* the power to appoint carries with it, the power to remove in the absence of any constitutional or statutory limitation or restriction of such power of removal. In *Town of Davis,* the West Virginia Supreme Court explained that

> if the power of removal were not given by the Code, it would exist, because the power to appoint carries with it as an incident the power to remove, in the absence of constitution or statutory restraint of such power. It is called by the United States [S]upreme [C]ourt, as it is, "a sound and necessary rule."

*Hennen's Cases,* 13 Pet. 230, 10 L.Ed. 138. Much authority sustains it. Mechem, Pub. Off. § 445. "Where the power of appointment is conferred in general terms, without restriction, the power of removal in the discretion and at the will of the appointing power is implied, and always exists unless restrained and limited by some provision of law." *Trainor v. Board* (Mich.) 15 L.R.A. 95, note (s. c. 89 Mich. 162, 50 N.W. 809).

*Town of Davis,* 35 S.E. at 7. In *Archer,* relying on *Town of Davis,* the West Virginia Supreme Court stated "[e]ven without the foregoing statute, the defendant, the County Court of Wirt County, having the power to appoint commissioners of accounts of that county, for which no definite term or tenure is fixed by law, as an incident to its power of appointment, has the power to remove a person so appointed in the absence of any constitutional or statutory limitation or restriction of such power of removal." *Archer,* 144 S.E.2d at 794. In *Archer,* the West Virginia Supreme Court noted that "in 67 C.J.S. Officers § 59b(2) [1], the text contains this language: 'As a general rule, in the absence of any limiting provision of a constitution or statute, the power of appointment carries with it, as an incident, the power to remove, where no definite term of office is fixed by law.'" *Id.*

In *Williams,* the West Virginia Supreme Court acknowledged its finding in *Archer* that "an at-will removal power is implied when the employer has the power of appointment and the office carries no fixed term." *Williams,* 437 S.E.2d at 778–79. The West Virginia Supreme Court ultimately concluded that *Archer* "would permit the removal of an assistant attorney

---

**1.** The West Virginia Supreme Court in *Williams* stated that the language from Corpus Juris Secundum cited by *Archer* "is now found in Section 118(b) (1978) of 67 C.J.S.

*Officers and Public Employees* (1978)," which this court notes is now located at 67 C.J.S. *Officers and Public Employees* § 149 (2002).

general even if the word 'pleasure' was not found in W. Va.Code, 5–3–3, because this section authorizes the Attorney General to appoint assistant attorneys general and provides no set term for their employment." *Id.* at 779.

This court does not view the above-cited statements in *Town of Davis, Archer* and *Williams* as mere dicta. Dicta is generally defined as "[a] judicial comment made during the course of delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential (though it may be considered persuasive)." Black's Law Dictionary 1100 (7th ed.1999). As the West Virginia Supreme Court recently noted in *Walker v. Doe,* 210 W.Va. 490, 558 S.E.2d 290, 295 (2001), "[t]he phrase, 'obiter dicta,' which translates 'a remark by the way,' is often shortened to just dicta and similarly references those comments or observations of a judge regarding a point that is incidental or collateral to the direct issue before the court or upon an analogous point introduced by way of illustration but not necessary to the determination of the instant case." (Footnote omitted.)

The statements by the West Virginia Supreme Court in *Town of Davis* originally, but also later in *Archer* and *Williams* were integral parts of the decisions in those cases. They were not statements made in passing or with little consideration. The West Virginia Supreme Court's holdings in the above cases, that the employees or officers were subject to the implied at-will removal power, were based not only on the substance of the statutes at issue, but also the principle that even in the absence of statutory language suggesting an at-will employment relationship, the power to appoint carries with it the implied power to remove in the absence of any limiting constitutional or statutory provision. The latter principle is not dicta, it is one of the two grounds upon

which the West Virginia Supreme Court based its holdings in the above cases.

To be clear, the court is not suggesting that the West Virginia Supreme Court in *Town of Davis, Archer* and *Williams* articulated some sort of two-part test, the first part of which requires the presence of the "at the pleasure of" or similar language in a statute. To the contrary, by the explicit language of *Town of Davis, Archer* and *Williams,* the absence of the "at the pleasure of" language in a statute is not determinative of the issue of whether the implied at-will removal power exists. Instead, as is the case with respect to West Virginia Code § 16–15–5, where there is a power to appoint and no fixed term of employment in the statute, even in the absence of "at the pleasure of" statutory language, the at-will power to remove is implied.

Notably, a review of *Town of Davis, Archer* and *Williams* reveals that the West Virginia Supreme Court itself has not treated its statements in those cases as mere dicta. In *Town of Davis,* the second ground for the court's holding, that even in the absence of the "at the pleasure of" language in the statute, the power to appoint carries with it, the power to remove in the absence of constitutional or statutory restraint of such power, was made a Syllabus Point. The West Virginia State Constitution requires that "[i]t shall be the duty of the court to prepare a syllabus of the points adjudicated in each case in which a majority of the justices thereof concurred, which shall be prefixed to the published report of the case." W. Va. Constitution, Article VIII, § 4. In *Archer,* the West Virginia Supreme Court relied on its findings in *Town of Davis. Archer,* 144 S.E.2d at 794–95. In *Williams,* wherein the West Virginia Supreme Court stated that in *Archer*

we found that an at-will removal power is implied when the employer has the

power of appointment and the office carries no fixed term. We also recognized that the power to remove could be limited by constitutional or statutory provisions .... Thus, *Archer* would permit the removal of an assistant attorney general even if the word "pleasure" was not found in W.Va.Code, 5–3–3, because this section authorizes the Attorney General to appoint assistant attorneys general and provides no set term for their employment.

*Williams,* 437 S.E.2d at 778–79. At the very least, the statements of the West Virginia Supreme Court in the above cases are highly persuasive.

The court has considered Plaintiff's arguments that certain provisions of the West Virginia Code pertaining to State housing law authorized CHA to enter into the Agreement. Plaintiff cites West Virginia Code § 16–15–5, along with West Virginia Code § 16–15–7(a)(16) which states that

> [a]n authority shall constitute a body both corporate and politic, exercising public powers, and having all the powers necessary or convenient to carry out and effectuate the purposes and provisions of this article, including the following powers in addition to others herein granted: ... [t]o make and execute contracts and other instruments necessary or convenient to the exercise of the powers of the authority ....

Plaintiff argues that these two sections must be read together with the stated purposes of the article, which include the necessity

> to confer upon and vest in said housing authorities all powers necessary or appropriate in order that they may engage in low and moderate cost housing development and slum clearance projects; and that the powers herein conferred upon the housing authorities, including

the power to acquire and dispose of property, to remove unsanitary or substandard conditions, to construct and operate housing developments and to borrow, expend and repay moneys for the purpose herein set forth, are public objects essential to the public interest.

W. Va.Code § 16–15–2 (2001).

The West Virginia Supreme Court's discussion in *Barbor* is instructive. In *Barbor,* the West Virginia Supreme Court considered what is now West Virginia Code § 6–6–8, *Williams,* 437 S.E.2d at 778, in determining whether the contract of a manager of the county poor farm could be annulled before expiration of its term. *Barbor,* 101 S.E. at 722. In addition to determining that the implied power to remove existed based on the language of what is now West Virginia Code § 6–6–8, which statute conferred the power to appoint and fixed no definite term of office, but instead provided that the tenure shall be at the pleasure of the appointing body, the West Virginia Supreme Court explained that the section of the West Virginia Code, which "makes the county court of every county a corporation, and in general terms empowers it to contract and be contracted with" does not "operate to validate a contract such as this." *Id.* at 722. Instead,

> [i]t merely makes the county court of every county a corporation, and in general terms empowers it to contract and be contracted with. Its specific authority, however, is only such as the Constitution and Legislature of the state have seen fit to bestow upon it.... Because of that restrictive statute [the predecessor to West Virginia Code § 6–6–8] the county court of Mercer county exceeded its authority in making the contract set forth in the declaration, thereby voiding it.

*Id.*

Having concluded that the implied at-will removal power applies as to officers

and employees of CHA pursuant to West Virginia Code § 16–15–5 as an incident to the power of appointment contained therein, the court further finds that there is no constitutional or statutory limitation on or restriction of such power of removal. Plaintiff cites no explicit statutory limitation or restriction on CHA's implied power of removal in her responsive memorandum or surreply. Plaintiff generally argues about the virtues of protected civil service, but does not actually assert that she is covered under a civil service system. *See Christopher v. City of Fairmont,* 167 W.Va. 710, 280 S.E.2d 284, 285–86 (1981) (The West Virginia Supreme Court determined that a water transportation and distribution supervisor was a public employee entitled to the procedural safeguards afforded under the Merit System Personnel Rules and Regulations of the City of Fairmont, rather than a public officer subject to removal with or without cause pursuant to West Virginia Code § 6–6–8.); *see also Williams,* 437 S.E.2d at 779 (noting that a person covered under a civil service system is afforded certain statutory protections surrounding employment and that assistant attorneys general are not covered by the State civil service system).

Giving Plaintiff the benefit of every doubt and in light of the fact that she argues the Personnel Policy creates a protected property interest in continued employment, it is conceivable that Plaintiff believes provisions in the Personnel Policy related to separation, the grievance procedure, and progressive discipline qualify as some sort of constitutional or statutory limitation on CHA's implied at-will removal power. (# 90, pp. 10–11; # 90, Exhibit J, pp. 20, 34–36.) As discussed further below, CHA's Personnel Policy did not modify Plaintiff's at-will employment, and the court cannot conclude that provisions in the Personnel Policy work to impose a limitation on CHA's implied at-will remov-

al power pursuant to West Virginia Code § 16–15–5.

Finally, though not addressed extensively by the parties, the court finds that West Virginia Code § 6–6–8 applies in the instant matter as between CHA and Plaintiff, a public officer. West Virginia Code § 6–6–8 permits the removal, with or without cause, of appointed public officers whose terms are not fixed by law:

> [t]he court, body or officer authorized by law to appoint any person to any county, magisterial district, independent school district, or municipal office, the term or tenure of which is not fixed by law, may remove any person appointed to any office by such court, board, body or officer, with or without cause, whenever such removal shall be deemed by it, them or him for the good of the public service, and the removal of any such person from office shall be final.

W. Va.Code § 6–6–8 (2000).

In *Christopher,* the West Virginia Supreme Court reiterated the legal distinction between a "public officer" and a "public employee" as follows:

> "As a general rule it may be stated that a position is a public office when it is created by law, with duties cast on the incumbent which involve an exercise of some portion of the sovereign power and in the performance of which the public is concerned, and which are continuing in their nature and not occasional or intermittent. But one who merely performs the duties required of him by persons employing him under an express or implied contract, though such persons themselves be public officers, and though the employment be in or about public work or business, is a mere employee."

*Christopher,* 280 S.E.2d at 285 (quoting *State ex rel. Key v. Bond,* 94 W.Va. 255, 118 S.E. 276, 279 (1923)).

■ In addition, the West Virginia Supreme Court restated the criteria to be considered in this determination:

"Among the criteria to be considered in determining whether a position is an office or a mere employment are whether the position was created by law; whether the position was designated as an office; whether the qualifications of the appointee have been prescribed; whether the duties, tenure, salary, bond and oath have been prescribed or required; and whether the one occupying the position has been constituted a representative of the sovereign."

*Id.* at 285 (quoting *State ex rel. Carson v. Wood,* 154 W.Va. 397, 175 S.E.2d 482, Syll. Pt. 5 (1970)). The West Virginia Supreme Court, applying the above test, ultimately determined that the supervisor in *Christopher* was a public employee rather than a public officer. *Id.* at 285–86. Because West Virginia Code § 6–6–8 did not apply to the supervisor, the West Virginia Supreme Court determined he was entitled to the procedural safeguards afforded other persons covered by the Merit System Personnel Rules and Regulations of the City of Fairmont. *Id.* at 286.

■ Unlike the supervisor in *Christopher,* Plaintiff is a public officer covered by West Virginia Code § 6–6–8 and, therefore, subject to removal with or without cause. West Virginia Code § 16–15–3(a) states that "[i]n each city and in each county there is hereby created a housing authority which shall be a public body corporate and politic. No authority hereby created shall transact any business or exercise its powers hereunder until or unless the governing body of the city . . ., by proper resolution, determines that there is a need for an authority . . . ." West Virginia Code § 16–15–3(d) states that "[w]hen

the governing body of a city adopts a resolution as aforesaid, it shall promptly notify the mayor of the adoption. Upon receiving the notice, the mayor shall appoint five persons as commissioners of the authority created for the city." As stated above, West Virginia Code § 16–15–5 permits commissioners to "select and appoint . . . officers and employees . . . ." Read together, the court finds that these provisions make West Virginia Code § 6–6–8 applicable to CHA.

For West Virginia Code § 6–6–8 to apply as to Plaintiff, Plaintiff must be an officer rather than an employee. *Christopher,* 280 S.E.2d at 285–86. Applying *Christopher,* there is undisputed evidence of record that Plaintiff was a public officer of CHA. Although Plaintiff's position was not created by law, the test reiterated in *Christopher* indicates that this and the other factors are " '[a]mong the criteria to be considered . . . .' " *Id.* at 285 (quoting *State ex rel. Carson,* 154 W.Va. 397, 175 S.E.2d 482, Syll. Pt. 5). Furthermore, West Virginia Code § 16–15–5 does contemplate the appointment of officers.

Moreover, the two job descriptions [2] dated June 14, 1993, and February 12, 1998, both of which describe the duties of the Executive Director, show that the Board delegated a significant portion of its sovereign power to the Executive Director. (# 102, Exhibit 1 (job descriptions dated June 14, 1993, and February 12, 1998).) In the job descriptions of the Executive Director dated February 12, 1998, and June 14, 1993, Plaintiff is described as the "Chief Executive Officer in overseeing the administration of the agency." (# 102, Exhibit 1, pages 1 of both job descriptions.) In addition, the job descriptions state that "[h]aving a broad latitude for independent

---

2. Defendants assert that Plaintiff helped formulate the job descriptions. (# 102, p. 6.) Plaintiff does not dispute this assertion.

action, the Executive Director is responsible for executing the policies." (# 102, Exhibit 1, pages 1 of both job descriptions.) Notably, the job description revised as of February 12, 1998, sets out in more detail the principal responsibilities of the Executive Director. Those responsibilities include interpreting, implementing and administering the policies of the Board and federal and State housing regulations, providing "administration, leadership and management of the agency," and directing and coordinating activities of managerial personnel engaged in carrying out agency objectives. (# 102, Exhibit 1, pp. 1–3 of job description dated February 12, 1998.) The job descriptions of the Executive Director very clearly show that the Executive Director was constituted a representative of the sovereign.

Plaintiff's testimony at her deposition confirms that she exercised some portion of the Board's sovereign power. Plaintiff stated that she was responsible for the hiring of employees of CHA. (# 90, Exhibit B (complete copy of January 28, 2003, deposition of Zelma Boggess), p. 319.) Plaintiff testified that after an employee resigned, she asked the employee to stay on until a replacement was hired. Plaintiff testified that the Board had not given her the authority to retain this individual after he resigned and that "[a]s executive director, that was my authority." (# 90, Exhibit B, pp. 178–79.) Plaintiff further testified that in her discretion, she permitted certain employees to work from home. (# 90, Exhibit B, pp. 272–73.)

Plaintiff testified that she had the authority, as Executive Director, to make expenditures on behalf of CHA. (# 90, Exhibit B, p. 65.) Plaintiff testified that while policy decisions were made by the Board, she developed procedures for the implementation of those policies "[n]ot always at [the Board's] direction." (# 90, Exhibit B, pp. 69–70.)

Plaintiff worked to establish two nonprofit corporations that worked with CHA. Plaintiff began Communities First of West Virginia, Inc., the purpose of which was to provide home ownership opportunities through federal funding. Plaintiff served this organization as secretary/treasurer. (# 90, Exhibit B, pp. 72–74.) This corporation's offices were initially located at CHA's administrative office, but Plaintiff later used her home address as the corporation's business location. (# 90, Exhibit B, p. 78.) Plaintiff also formed the Greater Kanawha Community & Economic Development Corporation (it later became Mountaineer Development Corporation), which was to have community development powers. Plaintiff also served as secretary/treasurer and as a director of this corporation. (# 90, Exhibit B, pp. 80–82, 87.)

Plaintiff directed the bidding for legal services. (# 90, Exhibit B, pp. 57–58, 128.) The firm of Goodwin & Goodwin, specifically Carrie Newton of that firm, was chosen to perform legal services. When Carrie Newton left Goodwin & Goodwin and indicated to Plaintiff that she would take the CHA work with her, Plaintiff did not seek Board approval. (# 90, Exhibit B, pp. 128–29.)

Plaintiff testified that she worked at home and, to that end, set up a home office. (# 90, Exhibit B, pp. 267, 269.) Plaintiff explained that she had "prerogative to do certain things that I feel—that I can do to accomplish my work, as long as I'm protecting the interest of the agency." (# 90, Exhibit B, pp. 269, 271.) Plaintiff testified that "[i]t was my discretion to take equipment for my use as executive director in my official work with Charleston Housing." (# 90, Exhibit B, p. 269.) Plaintiff confirmed that no one authorized her installation of a telephone line in her

home for use on CHA business. (# 90, Exhibit B, pp. 270–71.)

Plaintiff was granted leave to file a sur-reply to Defendants' reply memorandum in which Defendants assert that Plaintiff was an officer rather than an employee. Plaintiff does not refute the evidence cited by Defendants in support of the assertion that Plaintiff was an officer of CHA. A review of her deposition and the job descriptions of the Executive Director position, particularly the February 12, 1998, job description which Plaintiff helped formulate, provide compelling evidence that she was an officer of CHA. As such, West Virginia Code § 6–6–8 applies and is an additional basis for the Board's decision to remove her as Executive Director.

Because West Virginia Code § 16–15–5 permits the appointment of both officers and employees and affixes no set term and because there is no constitutional or statutory restriction on that power, an at-will removal power is implied in West Virginia Code § 16–15–5. *Williams,* 437 S.E.2d at 778–79. Because CHA possessed this power of removal, "this removal right may not be 'contracted away so as to bind the appointing body to retain [the employee] in such position for a definite fixed period,'" *Williams,* 437 S.E.2d at 779 (quoting *Barbor,* 85 W.Va. 359, 101 S.E. 721, Syllabus Point 4), and, therefore, the Agreement is void.

Based on the above, the court finds that all Defendants are entitled to summary judgment as to Count III of Plaintiff's Complaint.

b. *Agreement Violates Federal Law.*

Defendants also assert that the Agreement violates Federal law because HUD approval of the Agreement was not sought or given as required by the HUD Procurement Handbook. (# 56, pp. 11–12.) On this basis, Defendants argue that the Agreement between Plaintiff and CHA is void and that Plaintiff is an at-will employee of CHA who could be discharged for any reason not contrary to law or for no reason at all. (# 56, p. 12.)

Plaintiff asserts that Defendants have cited no authority to the effect that an otherwise valid employment contract would be deemed void for want of HUD approval. (# 90, p. 12.)

The court need not reach this argument made by Defendants in light of the above findings.

2. *Count I—Denial of Due Process.*

Next, Defendants argue that they are entitled to summary judgment as to Plaintiff's claim of a denial of due process under the Fourteenth Amendment because Plaintiff does not have a property interest in continued employment in light of the fact that the Agreement is void. (# 56, p. 12.)

Plaintiff argues that she was an employee rather than an officer of CHA and, consequently, she had both a property and liberty interest in the continuation of her public employment. (# 90, pp. 4–6.) In addition, Plaintiff asserts that even if the Agreement were void, CHA's Personnel Policy establishes Plaintiff's protected property interest. (# 90, pp. 10–12.) Plaintiff further asserts that the manner in which she was terminated violated her protected liberty interest. (# 90, p. 13.)

a. *Property Interest.*

"The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. When protected interests are implicated, the right to some kind of prior hearing is paramount." *Board of Regents v. Roth,* 408 U.S. 564, 569–70, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). To possess a property interest in employment, "a person clearly must have more than an

abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.* at 577, 92 S.Ct. 2701. "[A] property interest in employment can be created by statute, ordinance, or express or implied contract, 'the sufficiency of the claim of entitlement must be decided by reference to state law.'" *Pittman v. Wilson County,* 839 F.2d 225, 227 (4th Cir.1988) (quoting *Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976)); *see also Jenkins v. Weatherholtz,* 909 F.2d 105, 107 (4th Cir. 1990) (state law rules and understandings must provide a sufficient expectancy of continued employment).

Plaintiff, citing *Major v. DeFrench,* 169 W.Va. 241, 286 S.E.2d 688 (1982), states that upon showing that she was "a public employee, it follows that the plaintiff had both a property interest and a liberty interest in the continuation of her public employment." (# 90, p. 5.) *Major* does not stand for this proposition or anything close to it. In *Major,* the West Virginia Supreme Court acknowledged that "[a] 'property' interest protected by due process must derive from private contract or state law, and must be more than a unilateral expectation of continued employment." *Major,* 286 S.E.2d at 695. The West Virginia Supreme Court went on to determine that a specific statute dealing with probationary employment, "creates in the employee a reasonable expectancy that if she has satisfied all the eligibility requirements and has performed well on the job, her employment will be continued." *Id.*

■ Furthermore, as discussed above, the Agreement between Plaintiff and CHA was void pursuant to West Virginia law, and, as such, West Virginia State law does not establish a property interest in continued employment by virtue of the Agreement. *See Shlay v. Montgomery,* 802 F.2d 918, 921–22 (7th Cir.1986) (court found no

property interest because even if an oral employment contract existed as between plaintiff and the city, the oral contract for career employment would not have been enforceable as it was entered into in excess of the city's authority and, therefore it could not be the basis for a property interest in continued employment); *Kerr v. Keetley,* 39 F.3d 1177, 1994 WL 609645, at *2 (4th Cir.1994) (unpublished decision in which the United States Court of Appeals for the Fourth Circuit cites *Shlay* favorably in finding that because a purported contract was contrary to law it was invalid, and, therefore, the plaintiff had no property interest in continued employment by virtue of the contract).

■ Plaintiff asserts that even if the Agreement is void, CHA's Personnel Policy establishes Plaintiff's protected property interest. (# 90, pp. 10–12.) CHA's Personnel Policy does not establish anything other than at-will employment, and, therefore, it cannot be the basis for the Plaintiff's assertion of a property interest in continued employment.

In *Cook v. Heck's, Inc.,* 176 W.Va. 368, 342 S.E.2d 453, 457 (1986), the West Virginia Supreme Court stated that "[i]n the realm of the employer-employee relationship, West Virginia is an 'at will' jurisdiction ... [but] that contractual provisions relating to discharge or job security may alter the at will status of a particular employee." The West Virginia Supreme Court in *Cook* determined that "[t]he inclusion in the handbook of specified discipline for violations of particular rules accompanied by a statement that the disciplinary rules constitute a complete list is *prima facie* evidence of an offer for a unilateral contract of employment modifying the right of the employer to discharge without cause." *Id.* at 459.

Unlike the handbook in *Cook,* the Personnel Policy in the instant case does not

contain a promise by CHA not to discharge its employees who are explicitly covered by the Personnel Policy except for the offenses set forth in the Personnel Policy. Under the section entitled "Reasons for Immediate Dismissal," CHA's Personnel Policy states that "[a]ny employee will be subject to *immediate* dismissal without the necessity of compliance with the disciplinary action provision set forth in 9.1 above for any of the [twenty-four] conceivable reasons enumerated below." (# 90, Exhibit J (Charleston Housing Personnel Policy), pp. 20–22.) Under the section entitled "Dismissals," the Personnel Policy states that "[e]mployees may be dismissed according to Section 9, 'Disciplinary Action and Causes for Immediate Dismissal' of this policy." (# 90, Exhibit J, p. 22.) In comparison, the handbook in *Cook* specifically stated that it contains "[a] complete list of rules and disciplinary procedures . . . ." *Cook*, 342 S.E.2d at 455 (alteration from original).

While the Personnel Policy contains certain disclaimer language,[3] it is unnecessary for the court to make a finding as to its sufficiency in light of the above finding.

Finally, the court finds Plaintiff's reliance on *Trimboli v. Board of Educ.*, 163 W.Va. 1, 254 S.E.2d 561 (1979), misplaced. Plaintiff argues that in *Trimboli*, the West Virginia Supreme Court considered the interaction of West Virginia Code § 18–5–32, which clearly referred to discretionary employment, with rules intended to grant certain rights to employees, and concluded that the rules were enforceable. According to Plaintiff, the rules in *Trimboli* are

the functional equivalent of the "rules" found in the Personnel Policy, including "rules" related to separation cited above and those related to the grievance procedure for CHA employees. (# 90, pp. 10–11.)

In *Trimboli*, the plaintiff, a director of federal programs for Wayne County schools, was transferred from this position. West Virginia Code § 18–5–32 provided that the period of employment for directors such as the plaintiff was at the discretion of the board. *Trimboli*, 254 S.E.2d at 564–65. The West Virginia Supreme Court concluded that this section "appears to justify and prescribe Trimboli's employment for a term discretionary with the board, and one would conclude from it that he served at the board's pleasure." *Id.* at 565. However, the West Virginia Supreme Court cautioned that "an administrative board must abide by its rules, which . . . are in Policy No. 5300, (6)(a)"[4] and "the fact that the procedure was generous beyond statutory or constitutional requirements did not excuse a board of education from following it." *Id.* (citing *Powell v. Brown*, 160 W.Va. 723, 238 S.E.2d 220, 222 (1977)): Instead, the West Virginia Supreme Court determined that

evaluation and opportunity to improve [are] a mandatory function of every board of education, and right of every board employee. We do this, realizing that the result of Rule 5300(6)(a) is to give job protection to all school employees who are performing competently,

---

**3.** The preface to CHA's Personnel Policy states that "[t]he contents of this Policy are for your information, and are in no way intended to serve as an expressed or implied contract of employment." (# 90, Exhibit J, p. 7.) In describing the purpose of the Personnel Policy, the Personnel Policy states that it "is not to be considered or interpreted as terms

of an implied or express contract." (# 90, Exhibit J, p. 8.)

**4.** Policy No. 5300(6)(a) provided, in relevant part that "[e]very employee is entitled to know how well he is performing his job, and should be offered the opportunity of open and honest evaluation of his performance on a regular basis." *Id.*

against demotion, transfer or discharge without cause. Rule 5300(6)(a) has, in our view, fixed competent performance as the key to continued employment, just as effectively as would a statute to like effect.

*Id.* at 566.

The Personnel Policy at issue in the instant case and Policy Number 5300(6)(a) at issue in *Trimboli* and *Powell,* an additional case cited by Plaintiff and upon which *Trimboli* relies, are in no way analogous, much less "functionally equivalent." The suggestion that a rule adopted by the West Virginia Board of Education applicable to every local board of education and a provision of a personnel policy bear some likeness that makes the holdings of *Trimboli* and *Powell* applicable in the instant matter is not persuasive.

A more applicable and analogous scenario is found in *Darlington v. Mangum,* 192 W.Va. 112, 450 S.E.2d 809 (1994). In *Darlington,* the West Virginia Supreme Court decided the certified question of whether a county commission had the authority to require deputy sheriffs who wanted health insurance to pay a portion of the monthly premium. *Id.* at 810. The plaintiff relied on the county commission's personnel handbook, which provided that it would pay 100 percent of the employee's health insurance cost after the first twelve months of employment. The West Virginia Supreme Court, citing *Williams,* 437 S.E.2d at 779–80, stated that

we dealt with the question of whether statements in a public agency's employment manual could override a statutory provision. We decided that such statements were not binding and quoted from *Fiorentino v. United States,* 221 Ct.Cl. 545, 552, 607 F.2d 963, 968 (1979), *cert. denied,* 444 U.S. 1083, 100 S.Ct. 1039, 62 L.Ed.2d 768 (1980): It is unfortunately all too common for government manuals, handbooks, and in-house publications to

contain statements that were not meant or are not wholly reliable. *If they go counter to governing statutes . . . ., they do not bind the government, and persons relying on them do so at their own peril.*

*Id.* at 812. Thus, the court in *Darlington* concluded that statements in the county commission's personnel handbook did not bind the commission because the statements were contrary to West Virginia Code § 7–5–20, which authorized the county commission to require employees who elect to participate in the county's group health insurance to pay part of the premium cost. *Id.* at 812–13. In short, Plaintiff's argument ignores the more applicable cases discussed above related to personnel policies and handbooks that direct a different result.

Hence, the court concludes that Plaintiff has not shown she was deprived of a protected property interest.

### b. *Liberty Interest.*

■■■ Plaintiff asserts that even if she has no property interest by virtue of the Agreement or the Personnel Policy, her protected liberty interest was violated because CHA made false statements in the course of her termination. (# 90, p. 13.) Plaintiff asserts that "the manner in which her employment was terminated is itself sufficient to support a cause of action for defamation." (# 90, p. 13.) In addition, she states that

[t]he public proceedings and other actions of the Housing Authority and individual defendants related to plaintiff's termination were sufficient to seriously damage the plaintiff's standing in the community and to stigmatize her in a manner that foreclosed future employment opportunities. . . . The statement attributed to defendant Crothers, that the plaintiff would 'never get a job any-

where' (Affidavit of April Odell ¶ 9, copy attached hereto as Exhibit P) is evidence of both the defendants' state of mind and intention, and evidence that the defendants themselves believed their actions to be stigmatizing and sufficient to foreclose the plaintiff's future employment opportunities.

(# 90, p. 14.)

In her surreply, Plaintiff attached the reports of her experts, Nancy H. Leonard, Ph.D. and Gary K. Bennett, C.P.A., and argues that they show "the impact of the defendants' actions on the plaintiff's prospects for employment were overwhelmingly negative and resulted in substantial financial losses to the plaintiff." (Plaintiff's Surreply to Defendants' Amended Motion for Summary Judgment (# 106), pp. 2–3.) Plaintiff asserts that Dr. Leonard opined that

the actions of defendants have seriously damaged the plaintiff's career and her future prospects for employment. Moreover, the public manner of the plaintiff's suspension was such as to indicate that the plaintiff was guilty of a criminal act, since the CHA essentially made false public statements involving imputations of illegal, dishonest, or immoral conduct in the course of terminating the plaintiff, thus violating the plaintiff's protected liberty interest.

(# 106, p. 3.)

Defendants argue that Plaintiff has not even pleaded a violation of her liberty interest, much less identified facts sufficient to support such a claim under the Fourteenth Amendment. Defendants point out that Plaintiff fails to identify any particular stigmatizing and false remarks made publicly by Defendants in the course of Plaintiff's termination. Defendants further assert that the alleged comment of Defendant Crothers that Plaintiff "would never get a job anywhere" was made a full year before Plaintiff's termination. (# 102, pp. 13–14.)

A liberty interest is implicated and the right to procedural due process required when government action threatens an employee's good name, reputation, honor or integrity or his or her freedom to take advantage of other employment opportunities. *Roth*, 408 U.S. at 573, 92 S.Ct. 2701. There must be "public disclosure of the reasons for the discharge," *Bishop*, 426 U.S. at 348, 96 S.Ct. 2074, made in the course of the termination of employment, *Paul v. Davis*, 424 U.S. 693, 710, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), and the reasons must be false, *Codd v. Velger*, 429 U.S. 624, 627, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977) (per curiam).

Plaintiff does not identify a false statement made in public by CHA, the Board or anyone else at the time of her discharge which threatened her name, reputation, honor or integrity. The court has reviewed the minutes of the May 29, 2001, and the August 27, 2001, Board meetings at which the Board first voted to place Plaintiff on administrative leave and later, voted to terminate her. The minutes on May 29, 2001, indicate that a motion carried unanimously to place Plaintiff on administrative leave with pay and benefits for a period of ninety days. The minutes further indicate that Plaintiff was requested to turn in her keys, return the company car, not to correspond or contact CHA in the interim and to be available for any questions from the acting director, the Commissioners or legal counsel. (# 56, Exhibit E.) In Count V of the Complaint alleging defamation, Plaintiff asserts that at the May 29, 2001, public Board meeting when she was placed on administrative leave, Defendant Prezioso stated

Okay, Mrs. Boggess, we have a list of instructions. You can turn your keys [over] to our attorney, Mr. Peoples. He

will, uh, .... And we'd like you to return the car by the close of business on Friday. During this time, we'd like you not to correspond or have any correspondence or contact with Charleston Housing employees or property during the interim. We would like you to be available to answer questions from either the acting director, the commissioners, or our attorney. Are there any other instructions? [Katherine L. Dooley, defendant, and a lawyer] Nope.

(# 1, ¶ 58.)

Plaintiff was not terminated at the May 29, 2001, Board meeting and, instead, was placed on administrative leave. As a result, any damaging comments at the May 29, 2001, Board meeting did not "occur in the course of the termination of employment." *Paul*, 424 U.S. at 710, 96 S.Ct. 1155. Ignoring for a moment, the fact that Plaintiff was not terminated at this May 29, 2001, Board meeting, a review of the evidence submitted by Plaintiff does not reveal any statements which threatened her good name, reputation, honor or integrity or her freedom to take advantage of other employment opportunities. The comments of Defendants Prezioso and Dooley at the May 29, 2001, meeting are instructive and do not suggest "dishonesty" or "immorality" nor do they impose any sort of stigma foreclosing Plaintiff's opportunity to take advantage of other employment opportunities. *Roth*, 408 U.S. at 573, 92 S.Ct. 2701.

The minutes from the August 27, 2001, meeting at which Plaintiff was terminated indicate that the Board went into an executive session to discuss personnel matters. After the executive session concluded and the public meeting resumed, the minutes indicate that a motion was made to terminate Plaintiff for "failure on the part of the Executive Director to comply with Charleston Housing policy, directives of the Board, and additional matters ...."

(# 56, Exhibit G.) The motion carried. (# 56, Exhibit G.)

A report from the Charleston Gazette on August 28, 2001, quotes Defendant Prezioso as stating that Plaintiff was dismissed "for failure on the part of the executive director to comply with Charleston Housing policy directives of the board, and additional matters." (# 106, Exhibit 4 (Draft Report of Dr. Leonard), Exhibit I (Newspaper Articles).) In addition, this and numerous other newspaper reports note that the Commissioners would not say why they fired Plaintiff. (# 106, Exhibit 4, Exhibit I.) Instead, Defendant Dooley is quoted in the August 28, 2001, article as saying "[w]e'll detail that in a letter [to Boggess] ...." (# 106, Exhibit 4, Exhibit I.) In fact, by letter to Plaintiff dated September 21, 2001, Defendant's counsel, Charles W. Peoples, Jr., outlined the Board's reasons for termination. (# 56, Exhibit H.) There is no indication that this letter was ever made public and, therefore, it cannot be, nor does Plaintiff assert, that its contents are the basis for her protected liberty interest. *See Mills v. Leath*, 709 F.Supp. 671, 675 (D.S.C.1988) (the court found that although the reasons for plaintiff's discharge were stated in a letter privately transmitted to plaintiff and disclosed at a grievance hearing, the record was void of any evidence that the reasons for plaintiff's discharge were ever publicly disclosed).

The court can find no false statements made to the public in the course of terminating Plaintiff's employment that threatened Plaintiff's name, reputation, honor or integrity or her freedom to take advantage of other employment opportunities. In large part, the Board was publicly silent as to its reasons for terminating Plaintiff. The statement attributed to Defendant Prezioso by the Charleston Gazette that Plaintiff was terminated "for failure on the part of the executive di-

rector to comply with Charleston Housing policy directives of the board, and additional matters" (# 106, Exhibit 4, Exhibit I), does not suggest dishonesty or immortality on Plaintiff's part, nor does it foreclose any freedom to take advantage of other employment opportunities. *See Robertson v. Rogers,* 679 F.2d 1090, 1092 (4th Cir.1982) (holding that a superintendent's comments to prospective employers that plaintiff was terminated for "incompetence and outside activities" did not infringe on protected liberty interest); *Bunting v. City of Columbia,* 639 F.2d 1090, 1094 (4th Cir.1981) (holding that no liberty interest was implicated where the public reason for employees' dismissal was that their services "did not meet the expectations" of the public employer); *McBride v. City of Roanoke Redevelopment and Housing Auth.,* 871 F.Supp. 885, 891 (W.D.Va.1994) (holding that public statement, issued upon termination, that the housing authority board's decision was based on "lack of compatibility between [the executive director] and the manner in which the Board desires the Authority to be operated" did not deprive executive director of a protected liberty interest).

Plaintiff, in apparent acknowledgment of the absence of a false public statement by CHA that threatened her name, reputation, honor or integrity or her freedom to take advantage of other employment opportunities, argues that "[t]here is no requirement that the defendants' actions include a clear and overt charge against the plaintiff." (# 90, p. 13.) Plaintiff relies on *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 447 (2d Cir.1980). In addition, Plaintiff, citing *Donato v. Plainview–Old Bethpage Cent. School Dist.,* 96 F.3d 623, 632 (2d Cir.1996), asserts that stigmatizing allegations could also include charges going to professional incompetence when the charges are sufficiently serious. (# 90, p. 14.) Finally, Plaintiff

asserts that the statement of Defendant Crothers that Plaintiff would "never get a job anywhere" "is evidence of both the defendants' state of mind and intention, and evidence that the defendants themselves believed their actions to be stigmatizing and sufficient to foreclose the plaintiff's future employment opportunities." (# 90, p. 14.)

In her deposition, Plaintiff testified that Defendant Dooley "implied in a Board meeting that I was dishonest . . . ." (# 90, Exhibit B, p. 180.) Plaintiff does not identify whether this implication was made by Defendant Dooley in connection with her termination or at another time. When pressed about what Defendant Dooley said in a public meeting to imply this, Plaintiff testified that Defendant Dooley "said that the minutes were not correct." (# 90, Exhibit B, p. 180.) When asked if Defendant Dooley said "at any point during this conversation we're talking about that she thought you were dishonest," Plaintiff testified: "Not in those words. It was her tone, her attitude, her manner, her smirk and her laughing in the Board meeting." (# 90, Exhibit B, p. 181.)

Plaintiff testified that at one Board meeting, Defendant Crothers "implied that I had supplied dishonest information in a publication that went nationwide . . . ." (# 90, Exhibit B, p. 184.) Plaintiff testified that

> in order to stop this rumor from continuing, I called the City and tried to extricate what I could of what they had reported, and found out, as I suspected, that they had reported city-wide statistics, and yet I had tenants come and tell me that she was going around telling people that I supplied false information. That attacks my credibility, my integrity, and it's very hurtful, and I know that she knew that.

(# 90, Exhibit B, p. 184.) It does not appear this comment occurred at the Board meeting on August 27, 2001, when the Board voted to terminate Plaintiff, as she was not present at this meeting.

> Plaintiff further testified that
>
> I believe that ... I as a person was defamed in front of my peers when I was treated as a criminal, portrayed that I could not be trusted in a public meeting by instructions to turn in keys, to turn in the laptop, to turn in the list of items that I was instructed to turn in. I believe that defamation occurred when Ms. Crothers made statements in a Board meeting that I provided false information in a report with regard to the Section 3 award to the City of Charleston. I believe that I was defamed when Board meeting after Board meeting there were these insinuations and statements that they did not receive Board packets, that Ms. Crothers did not receive her Board packet when, in fact, she would refuse the packages in order to make me look bad in the public eye.

(# 90, Exhibit B, pp. 285–86.)

*Quinn* and *Donato*, which relies on *Quinn*, take a more expansive approach as to the existence of a liberty interest in the employment context than courts within the Fourth Circuit. As Plaintiff points out, the court in *Quinn* determined that an "explicit public statement" accusing the discharged employee of immoral or illegal conduct is not necessary. *Quinn*, 613 F.2d at 447. Instead, the court determined that

> [a] subtle campaign designed by city officials to make plaintiff the scapegoat for an episode of municipal misfeasance may impose no less an indelible stigma than a public proclamation announced at high noon from the steps of City Hall. Indeed, a carefully conceived scheme of suggestion and innuendo may be all the more devastating to individual liberty because it is more difficult to

refute, especially when its architects sit in the highest offices of local government. *Codd v. Velger* simply requires dissemination of a "false and defamatory Impression [sic]," not a detailed bill of particulars. Such an impression was arguably created here, at least for purposes of defeating summary judgment. *Id.* (citations omitted).

In *Donato*, the court, relying on *Quinn*, held that "[s]tigmatizing comments may include matters other than charges of illegality, dishonesty, or immorality." *Donato*, 96 F.3d at 630 (citing *Quinn*, 613 F.2d at 446 n. 4). In particular, the court in *Donato* held that governmental allegations that "denigrate the employee's competence as a professional and impugn the employee's professional reputation in such a fashion as to effectively put a significant roadblock in that employee's continued ability to practice his or her profession" may support a right to a hearing. *Id.* at 630–31.

■ The court cannot apply the rather expansive interpretations in *Quinn* and *Donato* of a protected liberty interest in light of the Fourth Circuit precedent cited herein. In *Robertson*, the Fourth Circuit stated that "[a]llegations of incompetence do not imply the existence of serious character defects such as dishonesty or immorality, contemplated by [*Roth* ] and are not the sort of accusations that require a hearing." *Robertson*, 679 F.2d at 1092. In *Beckham v. Harris*, 756 F.2d 1032, 1038 (4th Cir.1985), the plaintiff asserted an infringement upon a protected liberty interest arising from the publicity surrounding his termination. Plaintiff asserted that false information was spread by the defendants, severely damaging his reputation and good name. The Fourth Circuit rejected plaintiff's argument and explained that "[s]uch an assertion is more properly addressed in a state court defamation proceeding." *Id.*

Even if the court were to accept *Quinn* as controlling, Plaintiff has not shown evidence of a "carefully conceived scheme of suggestion and innuendo" designed to hurt Plaintiff's reputation. *Quinn*, 613 F.2d at 447. Consider the facts of *Quinn*, which differ significantly from those in the instant case. In *Quinn*, the plaintiff was discharged as the rehabilitation director for a model neighborhood corporation after funds could not be accounted for. The board of the model neighborhood corporation did not initially seek to remove the plaintiff, but the city rejected this decision and indicated all funding would cease in thirty days if the plaintiff was not terminated. *Id.* at 442–43. The city began a publicity campaign designed to coerce the board to dismiss the plaintiff. A series of articles appeared in the local press

> suggesting that [the plaintiff] was responsible for the missing funds. For example, the Syracuse Herald Journal reported that [certain of the defendants] had called for the dismissal of [plaintiff], but that [another individual's] resignation had not been accepted because he was "cooperating." Similarly, under headlines such as "Mayor Calls for Firing" and "Hint, Criminal Case," the Syracuse Post–Standard informed its readers that the case had "taken on a criminal aspect," specifically mentioning [the plaintiff].

*Id.* The plaintiff eventually was discharged, and the funding restored. A grand jury was impaneled to consider possible criminal charges against the plaintiff, which also drew significant media attention. No indictment was handed down against the plaintiff and, in fact, the grand jury affirmatively stated that the plaintiff "had no responsibility for the financial management of [the model neighborhood corporation], that he was wrongfully discharged, and that he should be reinstated." *Id.* at 444.

The court in *Quinn* determined that "the existence of a criminal investigation, the press reports linking [the plaintiff] with that investigation, and the role of the defendants in initiating a criminal inquiry all make it arguable that they openly charged [the plaintiff] with illegal and immoral conduct." *Id.* at 445. In addition, the court determined that this conduct amounted to a "scheme of suggestion and innuendo" affecting the plaintiff's individual liberty. *Id.* at 447.

The facts of the instant case simply do not rise to the level of those in *Quinn*. There have been no allegations of criminal conduct by CHA or the Commissioners against Plaintiff. Moreover, there was no effort by the Board to create a media campaign of suggestion and innuendo as to any wrongdoing by Plaintiff. The Board was largely silent about its reasons for dismissing Plaintiff, and the few comments that were made publicly come nowhere close to suggesting any kind of criminal conduct on the part of Plaintiff.

Therefore, the court concludes that Plaintiff has established neither a property nor liberty interest in employment. Consequently, all Defendants are entitled to summary judgment as to Count I.

3. *Count IV—West Virginia Wage Payment and Collection Act.*

▮▮▮ Plaintiff alleges in her Complaint that Defendants violated the West Virginia Wage Payment and Collection Act, West Virginia Code § 21–5–4(b) (2002), by failing to pay her within seventy-two hours after her August 27, 2001, termination, all wages due her, "including any wage adjustments due pursuant to her [Agreement]; payment for plaintiff's final day of work of August 27, 2001, at a rate of $45.23 per hour or $339.22, with continuing statutory interest thereon; and any monies due plaintiff pursuant to her [Agreement] as

outlined and more fully set forth herein." (# 1, ¶ 54.)

Defendants argue they are entitled to summary judgment as to Plaintiff's claim of a violation of the West Virginia Wage Payment and Collection Act because the Agreement was void and therefore, Plaintiff was entitled to no wages under it. In addition, Defendants argue that Plaintiff performed no labor or services on August 27, 2001, as she had been on administrative leave since May 29, 2001. Finally, Defendants assert that Plaintiff failed to mitigate her damages. Defendants assert that on August 28, 2001, CHA, through its general counsel, provided Plaintiff with a computation of the wages it believed were owed to Plaintiff upon her termination and invited Plaintiff to share any questions or disagreements she had with the computation, but she did not. (# 56, p. 13; # 56 Exhibits I (Letter from Charles W. Peoples, Jr. To Plaintiff's counsel dated August 28, 2001), J (Letter from Plaintiff's counsel to Mr. Peoples dated August 28, 2001), K (Letter from Mr. Peoples to Plaintiff's counsel dated August 29, 2001).)

In response, Plaintiff argues that as of May 29, 2001, when she was placed on administrative leave with full pay, she continued to be available to return to active work at any time, thus foregoing any other employment opportunity. Plaintiff asserts that this constitutes a service. (# 90, p. 14.) As to her alleged failure to mitigate damages, Plaintiff asserts that mitigation of damages in employment cases tends to revolve around a discharged employee's attempts to find equivalent work after discharge and that Defendants cite no authority for their novel mitigation argument. (# 90, pp. 15–16.)

In reply, Defendants offer further support for their failure to mitigate argument. (# 56, pp. 15–16.) In addition, Defendants assert that because Plaintiff was on administrative leave on August 27, 2001, when she was terminated, and was not rendering services, she is entitled to no wages for that date. (# 56, pp. 16–17.)

The West Virginia Wage Payment and Collection Act provides that "[w]henever a person, firm or corporation discharges an employee, such person, firm or corporation shall pay the employee's wages in full within seventy-two hours." W. Va.Code § 21–5–4(b). "Wages" are defined as "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis of calculation" and, as used in West Virginia Code § 21–5–4, "accrued fringe benefits capable of calculation and payable directly to an employee ...." W. Va.Code § 21–5–1(c) (2002).

The court has determined above that the Agreement is void. Because of this determination, it follows that Plaintiff is entitled to no additional wages under the Agreement. As to Plaintiff's claim for wages on August 27, 2001, the court finds that Plaintiff was not providing labor or services to CHA on that date because she had been placed on "Administrative Leave with pay and benefits for a period of 90 days" as of the Board's May 29, 2001, meeting. (# 56, Exhibit E.) Despite Plaintiff's arguments to the contrary, because she was on administrative leave as of May 29, 2001, she was not performing labor or services as defined in the Act on August 27, 2001. Therefore, all Defendants are entitled to summary judgment as to Count IV of the Complaint alleging a violation of the West Virginia Wage Payment and Collection Act.

4. *Count VI—Open Governmental Proceedings Act.*

In Count VI, Plaintiff alleges a violation of the Open Governmental Proceedings Act, West Virginia Code § 6–9A–7 (2000), because of Defendants' failure to conduct

the business of CHA in an open manner. Plaintiff alleges that violations of the Act occurred on May 10, 2001 by Defendant Prezioso, on May 29, 2001, by all named Commissioner defendants and on June 6, 2000, by Defendants Crothers, Dooley and Prezioso. (# 1, ¶¶ 66–68, 70.)

Defendants argue that Plaintiff's claims of violations of the Open Governmental Proceedings Act are barred by the 120–day statute of limitations set forth in West Virginia Code § 6–9A–6 (2000). Defendants assert that Plaintiff alleges violations on May 10, 2001, May 29, 2001, and June 6, 2000, but that Plaintiff did not file her Complaint until May 24, 2002. In addition, Defendants argue that Plaintiff does not specifically request any relief available under the Act and fails to allege facts sufficient to prove a violation of the Act. (# 56, p. 14.)

Plaintiff did not address this argument in her responsive memorandum.

The court finds that all Defendants are entitled to summary judgment as to Count VI of Plaintiff's Complaint. West Virginia Code § 6–9A–6 directs that a civil action to enforce provisions of the Open Governmental Proceedings Act be commenced "within [120] days after the action complained of was taken or the decision complained of was made." Plaintiff complains of alleged violations of the Open Governmental Proceedings Act on May 10, 2001, May 29, 2001, and June 6, 2000, but did not file her Complaint until May 24, 2002. Accordingly, Count VI is barred by the statute of limitations, and all Defendants are entitled to summary judgment as to this count.

### 5. Count VIII—Violations of Public Policy of West Virginia.

In Count VIII, Plaintiff realleges the allegations contained in the preceding paragraphs of her Complaint and asserts that "[t]he aforementioned behaviors constitute a violation of the public policies of the state of West Virginia." (# 1, ¶¶ 102–03.) Defendants contend that in Count VIII, Plaintiff is asserting a common law retaliatory discharge claim pursuant to *Harless v. First Nat'l Bank in Fairmont,* 162 W.Va. 116, 246 S.E.2d 270 (1978). Defendants note that Count VII of Plaintiff's Complaint alleges termination in violation of the West Virginia Human Rights Act and that pursuant to precedent from the United States District Court for the Southern District of West Virginia, the common law retaliatory discharge claim in Count VIII is preempted by the West Virginia Human Rights Act and must be dismissed. (# 56, p. 15.)

Plaintiff disagrees and argues instead that her public policy claim is not duplicative of her West Virginia Human Rights Act claim. Plaintiff avers that her claim in Count VIII is founded on the violation of West Virginia public policy "for public officers to attempt to intimidate and oppress a public employee in an unlawful effort to force that employee to withdraw from a contract that those same public officers believe to be valid and enforceable in an effort to circumvent the terms of that contract and avoid lawful contractual obligations." (# 90, p. 19.)

In reply, Defendants assert that Plaintiff did not plead this theory in her Complaint and she still has not identified any specific constitutional provision, statute or judicial opinion to support this theory. Defendants contend that Count VIII is too nebulous and unsupported to be maintained. (# 102, p. 18.)

Plaintiff's public policy claim as articulated in her response assumes that the underlying Agreement was valid. The court has determined herein that it was not and, as such, the underpinnings of Plaintiff's public policy claim as articulated in her response to Defendants' Amended

Motion for Summary Judgment are unsupported.

Therefore, all Defendants are entitled to summary judgment as to Count VIII of the Complaint.

**D.** *Counts I, II, III, IV, and VI as to all Commissioners in their Individual Capacities and Count VII as to Commissioners Comer and Prezioso in their Individual Capacities.*

**1.** *Counts I and II—Qualified Immunity.*

Defendant Commissioners argue that Counts I and II should be dismissed as to them in their individual capacities because even if Plaintiff can establish that they acted under color of State law and that their actions deprived Plaintiff of actual constitutional rights, Plaintiff cannot show that her Fourteenth Amendment Due Process and First Amendment rights were clearly established at the time of the alleged violations pursuant to *Robles v. Prince George's County,* 302 F.3d 262, 268 (4th Cir.2002) and *Trulock v. Freeh,* 275 F.3d 391, 399 (4th Cir.2001). (# 56, pp. 16–17.) According to Defendants, in assessing whether the right at issue was clearly established at the time of the breach, the focus is on "the right not at its most general or abstract level, but at the level of its application to the specific conduct being challenged." (# 56, p. 16 (quoting *Trulock,* 275 F.3d at 400)).

 The court has determined above that all Defendants are entitled to summary judgment as to Count I. Thus, the court will consider the individual Commissioner defendants' qualified immunity argument only as it relates to Count II. In Count II, Plaintiff alleges that when she was placed on administrative leave on May 29, 2001, she was instructed by Defendant Prezioso "not to correspond or have any correspondence or contact with Charleston Housing employees or property during the interim." (# 1, ¶ 33.) In addition, while on administrative leave and after her termination, Plaintiff alleges that CHA personnel were instructed by Defendant Prezioso "not to speak or communicate with the plaintiff . . . ." (# 1, ¶ 34.)

As to the First Amendment claim in Count II, the individual Commissioner defendants assert that they could find no law suggesting that the Board violated Plaintiff's First Amendment rights by prohibiting communication between Plaintiff and CHA employees during Plaintiff's administrative leave and thus interfering with Plaintiff's ability to defend herself in the action brought by Defendant Crothers in State court. (# 56, p. 17.)

Plaintiff argues that the individual Commissioner defendants misread *Trulock.* She asserts that *Trulock* does not require that the very act in question was previously determined to be unlawful. (# 90, pp. 19–20.)

The individual Commissioner defendants reply that they do not argue that they are entitled to qualified immunity because they could find no law involving identical facts as to Plaintiff's First Amendment claim. Instead, they assert that the unlawfulness of the conduct alleged in Count II is not apparent in light of pre-existing law, even if the action in question had not previously been held to be unlawful. (# 102, p. 19.) In addition, the individual Commissioner defendants point out that Plaintiff does not cite a single authority in support of the proposition that her rights were clearly established at the time of the alleged violation. (# 102, p. 21.)

Plaintiff brought the constitutional claim in Count II under 42 U.S.C. § 1983. Section 1983 provides that "[e]very person, who under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects . . . any citizen of the United States . . . to the deprivation of any rights,

privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.

 To establish a valid claim under § 1983, Plaintiff must show (1) that the actions of the Commissioners deprived Plaintiff of an actual constitutional right; and (2) that the right was clearly established at the time of the alleged violation. *Robles,* 302 F.3d at 268 (citing *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). As the Fourth Circuit stated in *Trulock,*

> [t]he court should focus upon "the right [not] at its most general or abstract level, but at the level of its application to the specific conduct being challenged." *Wiley v. Doory,* 14 F.3d 993, 995 (4th Cir.1994) (internal quotations omitted) (quoting *Pritchett v. Alford,* 973 F.2d 307, 312 (4th Cir.1992)); *see also Anderson v. Creighton,* 483 U.S. 635, 639–41, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right"). This does not mean, however, that an official will be protected by qualified immunity unless the very act in question has previously been held unlawful. *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034, 97 L.Ed.2d 523. Rather, the unlawfulness must be apparent in light of pre-existing law. *Id.*

*Trulock,* 275 F.3d at 400.

Assuming for purposes of argument that Plaintiff could show a violation of Plaintiff's First Amendment rights by the individual Commissioner defendants, Plaintiff has not cited any authority for her position that those rights were clearly established at the time she was put on administrative leave and later discharged. In short, Plaintiff has cited no pre-existing law,

from which it is apparent that the individual Commissioner defendants' alleged actions in Count II were unlawful. Thus, the court finds that the individual Commissioner defendants are granted qualified immunity from liability for the claim alleged in Count II.

2. *Counts III and VI—Violations of State Law (Breach of Contract and Open Governmental Proceedings Act).*

Defendant Commissioners argue that they should be dismissed in their individual capacities as to Count III alleging breach of contract because they were not parties to the Agreement. As to Count VI alleging violations of the Open Governmental Proceedings Act, the individual defendant Commissioners argue that they should be dismissed in their individual capacities because the Act does not impose individual liability in the civil context. (# 56, pp. 17–18.)

Plaintiff does not address these arguments in her responsive memorandum.

Count III alleging breach of the Agreement between CHA and Plaintiff must be dismissed as to the defendant Commissioners in their individual capacities because the court has determined that the Agreement was void. Even if the court had not reached this conclusion, the Agreement clearly states that it is "between Housing Authority of the City of Charleston ... and Zelma D. Boggess ...." (# 56, Exhibit B.) Inasmuch as the defendant Commissioners are not parties to the Agreement at issue in Plaintiff's breach of contract claim, that claim must be dismissed as to the defendant Commissioners in their individual capacities. *See Roberts v. Board of Educ.,* 25 F.Supp.2d 866, 868 (N.D.Ill.1998) (because contract that underlies the plaintiff's breach of contract claim was between plaintiff and the board of education, not the board members in their individual ca-

pacities, claims against board members in their individual capacities were dismissed).

As to Count VI alleging violations of the Open Governmental Proceedings Act, the court determined above that all Defendants, including the Commissioner defendants in their official and individual capacities, are entitled to summary judgment because Plaintiff filed her case outside the 120-day statute of limitations.

3. *Count IV—West Virginia Wage Payment and Collection Act.*

Defendant Commissioners, in their individual capacities, argue that they are entitled to immunity for any violation of the West Virginia Wage Payment and Collection Act pursuant to the Governmental Tort Claims and Insurance Reform Act, West Virginia Code § 29–12A–1 et seq. (2001). (# 56, pp. 18–19.)

Plaintiff asserts that the issue of whether the individual Commissioner defendants acted with a malicious purpose, in bad faith or in a wanton or reckless manner, thereby precluding immunity under the above statute, is a jury question. (# 90, p. 17.)

The court has determined above that Count IV must be dismissed as to all defendants because the Agreement was void and, thus, Plaintiff is entitled to no additional wages under it. As to wages Plaintiff alleges she was owed for August 27, 2001, the court determined that she was on administrative leave as of this date and was performing no labor or services which would entitle her to wages under the West Virginia Wage Payment and Collection Act. Thus, the court need not reach the question of immunity of the individual Commissioner defendants under West Virginia Code § 29–12A–1.

4. *Count VII—Comer and Prezioso.*

Individual defendant Commissioners Comer and Prezioso argue that they are entitled to a strong presumption that they did not engage in discrimination in violation of the West Virginia Human Rights Act, West Virginia Code § 5–11–1 et seq. (2002), because they participated in the decisions both to enter the rolling five-year Agreement with Plaintiff in 1998, and to terminate Plaintiff's employment in 2001. (# 56, pp. 19–20.) Defendants Comer and Prezioso rely on *Proud v. Stone,* 945 F.2d 796, 797 (4th Cir.1991), in which the Fourth Circuit reasoned that where the individual who fired the plaintiff is the same individual who hired him less than six months earlier with full knowledge of his age, "a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer."

Plaintiff asserts that *Proud* is not controlling because it does not involve the West Virginia Human Rights Act and because the hiring and firing in that case were just six months apart. In addition, Plaintiff, citing West Virginia case law, argues that in West Virginia, an employee may maintain an action under the West Virginia Human Rights Act against a fellow employee who aids and abets an employer engaging in unlawful discriminatory practices. (# 90, pp. 21–22.)

The individual defendant Commissioners Comer and Prezioso reply that the West Virginia Supreme Court of Appeals often looks to federal Title VII decisions, that Plaintiff provides no evidence to overcome the inference articulated in *Proud* and that if Comer and Prezioso violated the West Virginia Human Rights Act by aiding and abetting, they did not engage in conduct sufficient to destroy their immunity under the West Virginia Governmental Tort Claims and Insurance Reform Act, West Virginia Code § 29–12A–5(b) (2001). (# 102, p. 23.)

The court finds the presumption articulated in *Proud* inapplicable to the facts of

the instant case. Six months between the hiring and firing is significantly different from the three-year period in the instant case. Hence, the court denies the motion of Defendants Comer and Prezioso that they be granted summary judgment in their individual capacities as to Count VII.

Based on the above, it is hereby **OR-DERED** that the Amended Motion for Summary Judgment on behalf of Defendants with Regard to Counts I, III, IV, VI and VIII of Plaintiff's Complaint and the Defendants' Individual Liability is

(1) **GRANTED** at to all Defendants in all capacities with respect to Count I;

(2) **GRANTED** as to the individual Commissioner defendants with respect to Count II;

(3) **GRANTED** at to all Defendants in all capacities with respect to Count III;

(4) **GRANTED** at to all Defendants in all capacities with respect to Count IV;

(5) **GRANTED** at to all Defendants in all capacities with respect to Count VI;

(6) **DENIED** as to the individual Commissioner defendants Comer and Prezioso with respect to Count VII; and

(7) **GRANTED** at to all Defendants in all capacities with respect to Count VIII.

The Clerk is requested to mail a copy of this Memorandum Opinion and Order to all counsel of record and post this published opinion at *http://www.wvsd.uscourts.gov.*